**FANNING & DOORLEY CONSTRUC-TION CO., Inc., Plaintiff,**

v.

**GEIGY CHEMICAL CORPORATION d/b/a Alrose Chemical Company, Defendant and Counterclaimant.**

**Harrison P. EDDY, Jr., and Frank A. Marston, d/b/a Metcalf & Eddy, Engineers, Defendants,**

v.

**The AMERICAN INSURANCE COMPA-NY, Defendant to Counterclaim.**

**Civ. A. No. 3152.**

United States District Court
D. Rhode Island.

Oct. 28, 1969.

Aram A. Arabian, Providence, R. I., for plaintiff.

Richard M. Borod, Edwards & Angell, for Geigy Chemical Corp., Providence, R. I.

John T. Keenan, Providence, R. I., for Metcalf and Eddy.

Bernard F. McSally, Providence, R. I., for American Insurance Co.

## OPINION

PETTINE, District Judge.

This is a claim for payment of a balance due under a contract for the construction of a system of underground piping with a counterclaim by the defendant owner seeking liquidated and other damages. The American Insurance Company, defendant to the counterclaim, is the surety on the plaintiff's performance bond.

### Findings of Fact

Fanning & Doorley Construction Co., Inc. (hereinafter referred to as "Fanning & Doorley"), the plaintiff in this action, is a Rhode Island corporation engaged in the construction business. Defendant, Geigy Chemical Corporation (hereinafter referred to as "Geigy"), is a Delaware corporation with its main offices in Ardsley, New York. Geigy has a plant in Cranston, Rhode Island, called the Alrose Division, which is engaged in the manufacture of chemicals.

During the year 1958, Geigy decided to have constructed a new system of underground piping at its Alrose Plant and engaged Metcalf & Eddy, a Boston, Massachusetts firm of consulting engineers as advisors. They were retained to draw plans, specifications and prepare a contract. In addition, they were to let the contract for the construction of the system and supervise its execution. As a result, they prepared the "Book", so-called, which contained, among other things, information for bidders, form of bid, contractor's bond and specifications for the work to be done.

The work under this proposed contract consisted of the construction of cast-iron water piping, concrete storm drains, a vitrified clay sanitary sewer system, an industrial waste sewer system, and a booster pumping station and appurtenant work. Metcalf & Eddy, after investigation by one of its engineers, John Podger, recommended (and it was specified in the Book) that the industrial waste system be constructed of chemical stone ware bell and spigot pipe and that said pipe be joined by using a material called Causplit; a mortar produced by blending a resin and powder which is resistant to the corrosive effects of acids, alkalis and alcohols of the type that are discharged from the Alrose Plant.

In July, 1959, the Book was circulated to several contractors, including Fanning & Doorley, and bids were invited using the form of proposal contained therein. In the portion of the Book entitled "Information For Bidders," prospective bidders were warned to satisfy themselves by examination as to the actual conditions and requirements of the work and that the information furnished was not guaranteed to be accurate. In addition, bidders were advised to satisfy themselves regarding the character, quantities and conditions of the various materials which would be used.[1]

1. *Pertinent Provisions of the Contract*
    Plaintiff's Exhibit 1, known as "the Book" contains Information for Bidders, Form for Proposal and Bid Bond, Contract Agreement and Bond, and Specifications, both General and Detail.
    The Contract was executed on August 28, 1959.
    Article VI of the Contract provides that
        "The Information for Bidders, all Addenda, the Proposal submitted by the Contractor, the Specifications, and the the contract drawings are made parts of this contract." [Pl.Ex. 1, p. B38–C–6]
    The referred-to contract drawings consist of ten sheets of detailed plans and drawings. [Pl.Ex. 2]
    Information for Bidders contains the following pertinent provisions:
        "The Contractor agrees to use the products and methods designated or described in the specifications as amended by the Addenda.
            "Other Contracts
        "The attention of bidders is directed to the fact that at the time the work to be done under this contract is being per-

formed there may be other construction work in progress on the property of the owner.

"It is essential that all parties interested in the work being done for the Owner cooperate to the end that all of the work will be brought to a successful conclusion as rapidly as possible, but the Owner cannot guarantee that no interference or delay will be caused thereby. Interference and delay resulting from such cooperation shall not be the basis of claims against the Owner.

"Bidders to Investigate

"Bidders are required to submit their Proposals upon the following express conditions which shall apply to and become part of every bid received, viz.:

"Bidders must satisfy themselves by personal examination of the location of the proposed work and by such other means as they may wish, as to the actual conditions and requirements of the work and the accuracy of the estimated quantities stated in the Proposal." [Pl.Ex. 1, pp. B38–I–2, 3]

"Information Not Guaranteed

"All information given on the drawings or in the contract documents relating to borings, materials encountered, groundwater, subsurface conditions, and existing pipes and other structures is from the best sources at present available to the Owner. All such information and the drawings of existing construction are furnished only for the information and convenience of bidders.

"It is agreed and understood that the Owner does not warrant or guarantee that the materials, conditions, and pipes or other structures encountered during construction will be the same as those indicated by the boring samples or by the information given on the drawings or in the contract documents. The bidder must satisfy himself regarding the character, quantities, and conditions of the various materials and the work to be done.

"It further is agreed and understood that the bidder or the Contractor will not use any of the information made available to him or obtained in any examination made by him in any manner as a basis or ground of claim or demand of any nature, against the Owner or the Engineer, arising from or by reason of any variance which may exist between the information offered and the actual materials or structures encountered during the construction work, except as may otherwise be provided for

in the contract documents." [Pl.Ex. 1, p. B38–I–4]

"Time for Completion

"The Contractor will be required to complete the work within 180 consecutive calendar days after the date of the formal execution of the Contract Agreement.

"Liquidated Damages

"Liquidated damages, as set forth in the Contract Agreement attached hereto, will be assessed for each calendar day, Sundays and legal holidays excluded, of delay in the completion of the work not excusable as provided in the contract documents." [Pl.Ex. 1, p. B38–I–5]

"Attention Directed

"The attention of bidders is directed to the provisions of the Contract Agreement, General Specifications, and other parts of the documents relative to:
"Compliance with laws
Special precautions in the use of certain materials
Special requirements and conditions
Labor conditions
Sequence of operations

Handling industrial wastes, as described in EARTH EXCAVATION BACK-FILL, AND GRADING under Drainage.
Equipment furnished by Owner
Work to be done by others"
[Pl.Ex. 1, p. B38–I–8]

The Proposal contains the following provisions:

"The undersigned, as bidder, herein referred to as singular and masculine, declares as follows:
\* \* \* \* \*
"(4) he has examined carefully the location of the proposed work, the annexed proposed Contract Agreement, and the drawings and specifications therein referred to;
"(5) he understands that information relative to existing structures, apparent and latent conditions, and natural phenomena, as furnished to him on the drawings, in the contract documents, or by the Owner or the Engineer, carries no guarantee expressed or implied, as to its completeness or accuracy, and he has made due allowance therefor;
"(6) and he understands that the quantities of work tabulated in this Proposal or indicated on the drawings or in the specifications are only approximate and are subject to increase or decrease as deemed necessary by the Engineer;
"and he proposes and agrees that, if this Proposal is accepted, he will contract with the Owner, in accordance

with the copy of the contract documents deposited in the office of the Engineer, this Proposal form being part of and included in a copy of said documents, to provide all necessary machinery, tools, apparatus, and other means of construction and to do all the work and furnish all the materials specified in this contract in the manner and time therein prescribed and according to the requirements of the Engineer as therein set forth and that he will take in full payment for each item of work thereof the unit or lump-sum price aplicable to that item as stated in the schedule below." [Pl.Ex. 1, p. B38–P–1]

"The undersigned agrees that for extra work, if any, performed in accordance with the annexed form of Contract Agreement, he will accept compensation as stipulated therein.

"If this Proposal is accepted by the Owner, the undersigned agrees to complete the entire work proposed under the contract within 180 consecutive calendar days after the date of the formal execution of the Contract Agreement, except as otherwise provided therein.

"For informal comparison only and not to be considered as part of this Proposal, the total price for Items 1 to 25 inclusive, derived as described in the Information for Bidders under the heading 'Comparison of Bids,' is Two Hundred Four Thousand, One Hundred Forty-seven dollars and Fifty cents $204,147.50)". [Pl.Ex. 1, p. B38–P–14]

The Contract Agreement contains the following provisions:

"Art. II. The Contractor shall do all the work and furnish all the materials, tools, and appliances, except as otherwise specified herein, and everything necessary or proper for performing and completing the work required by this contract, in the manner and within the time hereinafter specified. The Contractor shall complete the entire work to the satisfaction of the Engineer, in accordance with the specifications and drawings herein mentioned, and at the prices herein agreed upon and therefor fixed. All the work, labor, and materials to be done and furnished under this contract shall be done and furnished strictly pursuant to and in conformity with the attached specifications and the directions of the Engineer as given from time to time during the progress of the work under the terms of this contract and also in accordance with the contract drawings.

"The Contractor shall coordinate his operations with those of any other contractors who may be employed on other work of the Owner, shall avoid interference therewith, and shall cooperate in the arrangements for storage of materials.

"The Contractor shall conduct his work so as to interfere as little as possible with private business and public travel. Wherever necessary or required, and at his own expense, he shall maintain fences, furnish watchmen, maintain lights, and take such other precautions as may be necessary to protect life and property.

"The Contractor shall take all responsibility for the work done under this contract, for the protection of the work, and for preventing injuries to persons and damage to property and utilities on or about the work. He shall in no way be relieved of his responsibility by any right of the Engineer to give permission or issue orders relating to any part of the work, by any such permission given or orders issued, or by failure of the Engineer to give such permission or issue such order. The Contractor shall bear all losses resulting to him or to the Owner on account of the quantity or character of the work, because of the nature of the land in or on which the work is done is different from what was estimated or expected, or on account of the weather, elements, or other causes. The Contractor shall assume the defense of all claims of whatsoever character against the Contractor or the Owner and indemnify and save harmless the Owner, its officers, or agents against all claims for injury or damage to persons, corporations, or property arising out of the work done under this contract whether said claims arise out of negligence or not, or whether said claims are groundless, false, or fraudulent or not, and from all claims relating to labor and materials furnished for the work. The Contractor shall not be required to indemnify the Owner against damage or claims occasioned solely by acts or omissions of the Owner other than supervisory acts or omissions of the Owner in connection with the work performed by the Contractor for the Owner, except as otherwise provided in the article relative to patents.

"The Contractor shall conduct his operations so as not to damage existing structures or work installed either by him or by other contractors. In case of any such damage resulting from his own operations, he shall repair and make good as new the damaged portions at his own expense with the consent of the damaged party. In the event that consent is not

given, the Contractor shall not be relieved thereby of liability for the damage caused." [Pl.Ex. 1, pp. B38–C–3, 4]

"Art. III. The supervision of the execution of this contract is vested in the Engineer, and his instructions shall be carried into effect promptly and efficiently.

"The Engineer shall in all cases determine the amount, quality, acceptability, and fitness of the several kinds of work and materials which are to be paid for under this contract, shall determine all questions in relation to said work and the construction thereof, and in all cases shall decide every question of fact which may arise relative to the fulfillment of this contract. In the event that a determination or decision of the Engineer is questioned by the Contractor, the decision of the Engineer shall be a condition precedent to the Contractor's right to receive any money for the work or materials to which the question or difference in opinion relates.

"If the Contractor considers any work demanded of him to be outside the requirements of the Contract or if he considers any decision or determination of the Engineer to be unfair, he shall immediately, upon such work being demanded or such decision or determination being made, ask for written instructions, decision, or determination. Such instructions, decision, or determination shall be given by the Engineer, in writing, within two days after the request therefor. Upon receipt of such written instruction, decision, or determination, the Contractor shall proceed without delay to perform the work or conform to the instructions, decision, or determination. Within 10 days after receipt of the written instructions, decision or determination, the Contractor may file a written protest with the Owner stating clearly and in detail his objections, the reasons therefor, and the nature and amount of damages which the Engineer's decision will cause him. A copy of such protest shall be filed with the Engineer at the same time as it is filed with the Owner. Unless the Contractor shall file such written protest with the Owner within such 10-day period, he shall be deemed to have waived all grounds for such protest and such damages and to have accepted the instruction, decision, or determination of the Engineer as just and reasonable and as being within the scope of the Contractor's obligations under the contract." [Pl.Ex. 1, p. B38–C–5]

"Art. IV. The Engineer shall make all necessary explanations as to the meaning and intention of the drawings and specifications and shall give all necessary orders and directions.

"The order or sequence of execution of the work and the general conduct of the work shall be subject to the approval of the Engineer who shall have authority to direct the order or sequence where public necessity or welfare shall require, which approval or direction shall, however, in no way affect the responsibility of the Contractor in the conduct of the work." [Pl.Ex. 1, B38–C–5, 6]

"Art. V. The Contractor shall give the work the constant attention necessary to facilitate the progress thereof and shall cooperate with the Engineer in every possible way.

"At all times, the Contractor shall have as his agent on the work a competent superintendent capable of reading and thoroughly understanding the drawings and specifications. The superintendent on the work shall have full authority to execute the orders or the directions of the Engineer without delay and to supply promptly such materials, equipment, tools, labor, and incidentals as may be required.

"Whenever the Contractor is not present on any part of the work where it may be desired to give directions, orders may be given by the Engineer and shall be received and obeyed by the superintendent or foreman who may have charge of the particular work in reference to which orders are given." [Pl.Ex. 1, p. B38–C–6]

"Art. VII. The drawings and specifications are intended to be explanatory of each other, but, should any discrepancy appear or any misunderstanding arise as to the import of anything contained in either, the interpretation and decision of the Engineer shall be final and binding on both parties to this contract.

"Any correction of errors or omissions in drawings and specifications may be made by the Engineer when such correction is necessary for the proper fulfillment of their intention as construed by him. Where said correction of errors or omissions, except as provided in the next two paragraphs below, adds to the amount of work to be done by the Contractor, compensation for said additional work shall be made under the item for Extra Work except where the additional work may be classed under some item of work for which a unit price is included in the Proposal.

"The fact that specific mention of a fixture or of any part of the work is omitted in the specifications, whether intentionally or otherwise, when the same is clearly indicated on the drawings, or is usually and customarily required to complete fully

such work as is specified herein, will not entitle the Contractor to consideration in the matter of any claim for extra compensation, but the said fixtures or work or both shall be installed or done the same as if called for both by the drawings and by the specifications.

"All work indicated on the drawings and not mentioned in the specifications, or vice versa, and all work and material usual and necessary to make the work complete in all its parts, whether or not they are indicated on the drawings or mentioned in the specifications, shall be furnished and executed the same as if they were called for both by the drawings and by the specifications." [Pl.Ex. 1, pp. B38–C–6, 7]

"Art. XV. The Owner may delay the beginning of the work or any part thereof if it is deemed in the Owner's interest so to do. The Contractor shall have no claim for damages on account of such delay, but shall be entitled to so much additional time wherein to perform and complete this contract on his part as the Engineer shall certify in writing to be just." [Pl.Ex. 1, p. B38–C–11]

"Art. XVI. The rate of progress shall be such that the whole work shall be performed in accordance with the terms of this contract before the expiration of the time limit stipulated in the Proposal, unless and except as any part may be delayed under the provisions of this contract.

"It is agreed that the rate of progress herein required has been purposely made low enough to allow for the ordinary delays incident to construction work of this character. No extention [sic] of time will be made for ordinary delays, inclement weather, and accidents, and the occurrence of such will not relieve the Contractor from the necessity of maintaining this rate of progress.

"If delays are caused by acts of God, acts of Government or State, strikes, extra work, or other contingencies clearly beyond the control or responsibility of the Contractor, the Contractor shall be entitled to so much additional time wherein to perform and complete this contract on his part as the Engineer shall vertify [sic] in writing to be just. *

"* This paragraph will be interpreted to include delays in receipt of equipment provided that the Contractor placed his order and submitted shop drawings for such equipment promptly after execution of the contract, that he has shown due diligence in following the progress of the order, and that the time required for delivery

is in accordance with conditions generally prevailing in the industry."

"The time in which this contract is to be performed and completed is of the essence of this agreement." [Pl.Ex. 1, pp. B38–C–11, 12]

"Art. XVII. In case the Contractor fails to complete satisfactorily the entire work contemplated and provided for under this contract on or before the date of completion determined as described above, the Owner shall deduct from the payments due the Contractor each month the sum of Seventy-Five Dollars ($75) for each calendar day (Sundays and legal holidays excluded) of delay, which sum is agreed upon not as a penalty, but as fixed and liquidated damages for each day of such delay, to be paid in full and subject to no deduction. If the payments due the Contractor are less than the amount of such liquidated damages, said damages shall be deducted from any other moneys due or to become due the Contractor, and, in case such damages shall exceed the amount of all moneys due or to become due the Contractor, the Contractor or his Surety shall pay the balance to the Owner." [Pl.Ex. 1, p. B38–C–12]

"Art. XXIII. The Engineer shall be furnished with every reasonable facility for ascertaining that the work is in accordance with the requirements and intention of this contract, even to the extent of uncovering or taking down portions of finished work.

"Should the work thus exposed or examined prove satisfactory, the uncovering or taking down and the replacement of material and rebuilding of the work shall be considered as extra work unless the original work was done in the absence of the Engineer or his inspector without his written authorization, in which case that section of the General Specifications titled 'Work to Conform' shall govern. Should the work exposed or examined prove unsatisfactory, the uncovering, taking down, replacing, and making good shall be at the expense of the Contractor." [Pl.Ex. 1, p. B38–C–14]

"Art. XXIV. The inspection of the work shall not relieve the Contractor of any of his obligations to fulfill his contract as herein prescribed, and defective work shall be made good and unsuitable materials shall be rejected, notwithstanding that such work and materials have beeen previously overlooked by the Engineer and accepted or estimated for payment. If the work or any part thereof shall be found defective at any time before the final acceptance of the whole work, the Contractor shall forthwith make good such defect in a manner satisfactory

to the Engineer; if any material brought upon the ground for use in the work, or selected for the same, is condemned by the Engineer as unsuitable or not in conformity with the specifications, the Contractor shall forthwith remove such materials from the vicinity of the work, and any material furnished by the Owner which shall be damaged or rendered defective by the handling or improper installation by the Contractor, his agents, or employees shall be made good and replaced at the Contractor's own expense." [Pl.Ex. 1, p. B38–C–14]

"Art. XXV. The Contractor shall take all precautions to prevent damage to the work by storms or by water entering the site of the work directly or through the ground. In case of damage by storm or water, the Contractor shall make such repairs or replacements or rebuild such parts of the work as the Engineer may require in order that the finished work may be completed as required by the drawings and specifications.

"The Engineer may prohibit the carrying out of any work at any time when, in his judgment, the conditions are not suitable or the proper precautions are not being taken, whatever the weather may be, in any season." [Pl.Ex. 1, p. B38–C–15]

"Art. XXVI. The Contractor shall make good any defects, omissions, or mistakes for which he or his employees are responsible, or he shall pay to the Owner all expenses, losses, and damages incurred therefrom as determined by the Engineer." [Pl.Ex. 1, p. B38–C–15]

"Art. XXVIII. The Engineer may make alterations in the line, grade, plan, form, dimensions, or materials of the work or any part thereof, either before or after the commencement of construction. If such alterations increase or diminish the quantity of work to be done, adjustment for such increase or decrease shall be made at the unit prices stipulated for such work under this contract, except that, if unit prices are not stipulated for such work, compensation for increased work shall be made under the item for extra work, and for decreased work the Contractor shall allow the Owner a reasonable credit as determined by the Engineer. If such alterations diminish the quantity of work to be done, they shall not warrant any claim for damages or for anticipated profits on the work that is eliminated." [Pl.Ex. 1, B38–C–15]

"Art. XXIX. The Contractor shall do any work incidental to the proper completion of the contract and not otherwise provided for herein, when and as ordered in writing by the Engineer, either (a) at the price agreed upon before the work is commenced and named in the order for the work or (b), if the Engineer so elects, for the reasonable cost of said work, as determined by the Contractor and approved by the Engineer, plus a percentage of such cost, as set forth below. No extra work shall be paid for unless specifically ordered as such in writing by the Engineer.

\* \* \* \* \*

"To the cost of extra work done by the Contractor's own forces under (b) above (determined as stated above), the Contractor shall add 15 percent to cover his overhead, allowance for use of capital the premium on the Bond as assessed upon the amount of this extra work, and profit." (Pl.Ex. 1, p. B38–C–16, 17]

"Art. XXX. When extra work is ordered near the completion of the contract or when extra work is ordered at any time during the progress of the work which requires in the opinion of the Engineer an unavoidable increase of time for the completion of the contract, a suitable extension of the time for completion shall be made." [Pl.Ex. 1, p. B38–C–17]

"Art. XXXI. It is distinctly agreed and understood that any changes made in the drawings and specifications for this work (whether such changes increase or decrease the amount thereof) or any change in the manner or time of payments made by the Owner to the Contractor shall in no way annul, release or affect the liability and surety on the Bond given by the Contractor." [Pl.Ex. 1, p. B38–C–17]

"Art. XXXII. If the Contractor claims compensation for any damages sustained by breach of contract or otherwise he shall, within 10 days after sustaining such damages, file with the Engineer a written, itemized statement, in triplicate, of the details and amount of such damage. Unless such statement is made as required, his claim for compensation shall be forfeited and invalidated, and he shall not be entitled to payment on account of any such damage. Within 10 days after receiving such statement, the Engineer shall file with the Owner one copy of the statement, together with his recommendations for action by the Owner.

"If the Contractor claims compensation for damages resulting from instructions, determinations, or decisions of the Engineer, such claims shall not be considered unless the Contractor has filed a written protest in the manner set forth

in the article titled 'Authority of the Engineer'." [Pl.Ex. 1, p. B38–C–18]

"Art. XXXIII. If the work to be done under this contract shall be abandoned, if this contract or any part thereof shall be sublet without the previous written consent of the Owner, if the contract or any claim thereunder shall be assigned by the Contractor otherwise than as herein specified, or if at any time the Engineer shall be of the opinion, and shall so certify in writing, that the conditions herein specified as to the rate of progress are not fulfilled, that the work or any part thereof is unnecessarily or unreasonably delayed, or that the Contractor has violated any of the provisions of this contract, the Owner may notify the Contractor by a written order, with a copy mailed to the home office of the Surety, to discontinue all work, or any part thereof; thereupon the Contractor shall discontinue such work or such part thereof as the Owner may designate; and the Owner may thereupon, by contract or otherwise as it may determine, complete the work, or such part thereof, and charge the entire expense of so completing the work or part thereof to the Contractor. For such completion the Owner, for itself or its contractors, may take possession of and use or cause to be used in the completion of the work or part thereof any of such materials, equipment, machinery, implements, and tools of every description as may be found at the location of said work.

"All expenses charged under this article shall be deducted and paid by the Owner out of any moneys then due or to become due the Contractor under this contract or any part thereof; in such accounting, the Owner shall not be held to obtain the lowest figures for the work of completing the contract or any part thereof, or for ensuring its proper completion, but all sums actually paid therefor shall be charged to the Contractor. In case the expenses so charged are less than the sum which would have been payable under this contract if the same had been completed by the Contractor, the Contractor shall be entitled to receive the difference, and, in case such expenses shall exceed the said sum, the Contractor shall pay the amount of the excess to the Owner." [Pl.Ex. 1, pp. B38–C–18, 19]

"Art. XXXIV. The Owner shall pay, and the Contractor shall receive, the prices stipulated in the Proposal attached hereto as full compensation for everything furnished and done by the Contractor under this contract, including all work required but not specifically mentioned, and also for all loss or damage arising out of the nature of the work aforesaid, from the action of the elements, or from any unforeseen obstruction or difficulty encountered in the prosecution of the work, for all risks of every description connected with the work, for all expenses incurred by or in consequence of the suspension or discontinuance of the work as herein specified, and for well and faithfully completing the work and the whole thereof, as herein provided." [Pl. Ex. 1, p. B38–C–19]

"Art. XXXVI. It is agreed that this is an entire contract for one whole and complete work and that no partial payments on account by the Owner nor the use of parts of the proposed work shall constitute an acceptance of any part of the work before its entire completion and final acceptance." [Pl.Ex. 1, p. B38–C–19]

"Art. XL. Neither the inspection by the Owner or any of its agents; nor any order, measurement, or certificate by the Engineer; nor any order by the Owner for the payment of money; nor any payment for or acceptance of the whole or any part of the work by the Owner; nor any extension of time; nor any possession taken by the Owner or its employees shall operate as a waiver of any provision of this contract, of any power herein reserved to the Owner, or any right to damages herein provided; nor shall any waiver of any breach of this contract be held to be a waiver of any other or subsequent breach. Any remedy provided in this contract shall be taken and construed as cumulative, that is, in addition to each and every other remedy herein provided and in addition to all other suits, actions, or legal proceedings, the Owner shall also be entitled as of right to a writ of injunction against any breach of any of the provisions of this contract." [Pl.Ex. 1, p. B38–C–21]

"Art. XLII. The Contractor guarantees that the work to be done under this contract, and the workmanship performed and the materials and equipment used in the construction of the same, shall be free from defects or flaws, that each item of equipment shall be in accordance with the specifications, that the strength of all parts of all manufactured equipment shall be adequate and that the performance test requirements of the specifications shall be fulfilled. This guarantee shall be for a period of one year from and after the date of completion of the work as stated in the final estimate. The Contractor shall repair or replace as required, promptly and without charge, all work, equipment, and

material, or parts thereof, which fail to meet the above guarantee during the one year herein quoted.

"It is thereby, however, especially agreed and understood that this guarantee shall not include any repairs or replacements made necessary by any cause or causes other than improper, inadequate, or defective work, workmanship, materials, or design by the Contractor or those employed directly or indirectly by him." [Pl.Ex. 1, p. B38–C–22]

The Contract contains a Bond executed by Fanning & Doorley as Principal and The American Insurance Company, as Surety, in the sum of $204,147.50, conditioned on the full performance by Fanning & Doorley of all of the agreements, terms and conditions of the Contract of August 28, 1959. [Pl.Ex. 1, p. B38–C–26]

The Specifications—General contain the following provisions:

"The work to be done and paid for under any item shall not be limited to the exact extent mentioned or described, but shall include all incidental work necessary or customarily done for the completion of that item." [Pl.Ex. 1, p. B38–SG–2]

"The Contractor shall make all measurements and check all dimensions necessary for the proper construction of the work called for by the drawings and specifications. During the prosecution of the work, he shall make all necessary measurements to prevent misfitting in said work, and he shall be responsible therefor, and for the accurate construction of the entire work." [Pl.Ex. 1, p. B38–SG–8]

"*Section XIV. Work to Conform.* During its progress and on its completion, all work shall conform truly to the lines, levels, and grades indicated on the drawings or given by the Engineer and shall be built in a thoroughly substantial and workmanlike manner, in accordance with the drawings and specifications and the directions given from time to time by the Engineer. In no case shall any work in excess of the requirements of the drawings and specifications be paid for unless ordered in writing by the Engineer." [Pl.Ex. 1, p. B38–SG–8]

"*Section XIX. Interference with Existing Works.* The Contractor shall at all times conduct his operations so as to interfere as little as possible with the existing facilities. The Contractor shall develop a program, in cooperation with the Engineer and Owner which shall provide for the construction and putting into service of the new works in the most orderly manner possible. This program shall be adhered to except as deviations therefrom are expressly permitted. All work of connecting with, cutting into, and reconstructing existing pipes or structures shall be planned to interfere with operation of the existing facilities for the shortest possible time when the demands on the facilities best permit such interference, even though it may be necessary to work outside the normal working hours to meet these requirements. Before starting work which will interfere with the operation of the existing facilities, the Contractor shall do all possible preparatory work and shall see that all tools, materials, and equipment are made ready and at hand.

"The Contractor shall make such minor modifications in work relating to existing structures as may be necessary where existing pipes, etc., are not found exactly as indicated on the drawings, without additional compensation." [Pl.Ex. 1, pp. B38–SG–10, 11]

"*Section XX. Sequence of Operations.* In view of the fact that the work to be done is in an area housing a manufacturing industry, the sequence of operations will depend in part upon the schedule of manufacturing processes. To minimize delays and interferences, the Contractor shall, in cooperation with the Chief Engineer, develop a sequence of operations intended to avoid interferences with manufacturing operations. The Contractor shall, from time to time, modify the sequence of operations as deemed necessary by the Chief Engineer so as to minimize any interference * * *" [Pl.Ex. 1, p. B38–SG–11]

"*Section XXII. Precautions against Adverse Weather.* During adverse weather and against the possibility thereof, the Contractor shall take all necessary precautions so that the work may be properly done and satisfactory in all respects. When required, protection shall be provided by use of tarpaulins, wood and building-paper shelters, or other approved means.

"During cold weather, materials shall be preheated, if required, and the materials and adjacent structure into which they are to be incorporated shall be made and kept sufficiently warm so that a proper bond will take place and a proper curing, aging, or drying will result. Protected spaces shall be artificially heated by approved means which will result in a moist or a dry atmosphere according to the particular requirements of the work being protected. Ingredients for concrete and mortar shall be sufficiently

heated so that the mixture will be warm throughout when used.

"The Engineer may suspend construction operations at any time when, in his judgment, the conditions are unsuitable or the proper precautions are not being taken, whatever the weather may be, in any season." [Pl.Ex. 1, pp. B38–SG–11, 12]

"Wherever 'abandon,' 'remove,' or words of like import are used on the drawings in reference to existing pipes or structures, the Contractor shall remove and dispose of all existing work which interferes with the new work to be done, all as determined by the Engineer. Open ends of abandoned pipes or other structures shall be bulkheaded with brick masonry with mortar joints, Class A concrete or other approved method." [Pl. Ex. 1, p. B38–SG–14]

"*Section XXVIII. Equipment Furnished by Owner*. The Owner will furnish and deliver to the site, pumping equipment, metering and appurtenances to be installed under this contract.

"In the event that the Owner is unable to furnish equipment in time for its installation, the Contractor agrees to suspend work as necessary and shall make no claim for damages thereby; however, he shall be granted an extension of time in which to complete this contract. Such extension shall be equal to the number of calendar days between that on which no usable equipment can be furnished to him and the day he is notified that such equipment has become available." [Pl.Ex. 1, p. B38–SG–15]

The Specifications—Detail contain the following provisions:

"*Section 1.7 Drainage*. At all times during construction the Contractor shall provide and maintain ample means and devices (including spare units for use in case of breakdowns) with which to remove promptly and dispose properly of all water entering trenches and other excavations and keep said excavations dry until the structures, pipes, and appurtenances to be built therein have been completed to such extent that they will not be floated or otherwise damaged.

"All water pumped or drained from the work shall be disposed of in a suitable manner without undue interference with other work or damage to pavements, other surfaces, or property. Suitable temporary channels shall be provided for water that may flow along or across the site of the work.

"The Contractor shall also handle sewage and industrial wastes in an approved manner whenever, due to his operations, these services are interrupted. Sewage shall be handled in such a manner that it will eventually be discharged into the City sewerage system. Industrial wastes are highly corrosive and shall be discharged to the Pawtuxet River in such a manner that there is no danger to existing structures, new work or personnel." [Pl.Ex. 1, p. B38–SD–3]

"*Section 1.14 Excavation near Existing Structures*. Attention is directed to the fact that there are water pipes, gas pipes, drains, and other utilities in certain locations. Some of these have been indicated on the drawings, but no attempt has been made to show all of the services, and the completeness or accuracy of the information given is not guaranteed. In certain critical locations, test pits, to be paid for will be dug ahead of the work to aid in the selection of a route for the pipe involving a minimum of interference with existing utilities.

"As the excavation approaches pipes, conduits, or other underground structures, digging by machinery shall be discontinued and the excavation shall be done manually, as directed. Such manual excavation when incidental to normal excavation shall be included in the work to be done as normal excavation." [Pl. Ex. 1, p. B38–SD–5]

"*Section 1.15 Protection of Existing Structures*. All existing structures, including buildings, pipes, poles, wires, fences, curbings, property-line markers, and other structures which, in the opinion of the Engineer, must be preserved in place without being temporarily or permanently relocated, shall be carefully supported and protected from injury by the Contractor. The Contractor's attention is directed to the fact that there are excavations near, under and within certain buildings. In case of injury to any structure they shall be restored by him, without compensation therefor, to at least as good condition as that in which they were found immediately prior to the start of the work." [Pl.Ex. 1, p. B38–SD–5]

"*Section 1.16 Relocation of Existing Structures*. Whenever the Contractor encounters underground pipes, wires, or other structures not otherwise provided for in these specifications, which are located so near and parallel to or actually in the excavation, that, in the opinion of the Engineer, satisfactory construction cannot proceed until they have been removed, the Contractor shall, as directed, remove and change, relocate, or later restore such portions thereof as the Engineer shall order in writing, and

such work shall be paid for as Extra Work." [Pl.Ex. 1, p. B38–SD–5]

"*Section 1.24 Backfilling around Structures.* As soon as practicable after the pipes and masonry have been placed, the joints and concrete have acquired a suitable degree of hardness, and other necessary work has been done, special leakage and pressure tests, if required, shall be made, after which backfilling shall begin and thereafter shall be prosecuted expeditiously. The best of the excavated materials shall be used in backfilling within 2 ft. of the structure, and unequal soil pressures shall be avoided by carrying the fill up evenly. The materials shall be sufficiently compacted to prevent settlement and, if compacted by rolling or ramming, shall be deposited in suitable layers, wet if required." [Pl.Ex. 1, p. B38–SD–8]

"*Section 1.25 Backfilling in Open Trench.* As soon as practicable after the pipe has been placed and the pipe joints have acquired a suitable degree of hardness and other necessary work done, the backfilling shall begin and thereafter shall be prosecuted expeditiously * *." [Pl.Ex. 1, p. B38–SD–8]

"*Section 15.8 Leakage.* The sewers and manholes shall be made as nearly watertight as practicable and leakage measurements shall be made unless determined by the Engineer not to be possible.

"Leakage into the sewer, including manholes, shall not exceed 500 gallons per inch diameter in 24 hours per mile of sewer. Leakage between any two adjacent manholes shall not exceed 1,000 gallons per 24 hours per inch diameter per mile of sewer. There shall be no gushing or spurting streams entering the sewer or manholes.

"Where practicable the leakage tests shall be made at a time when the groundwater is at least 1 ft. above the top of the pipe of the highest section of work being tested.

"Where the groundwater level is less than 1 ft. above the top of the pipe and the slope of the pipe between adjacent manholes will permit, the sewers shall be subjected to an internal pressure by plugging the pipe at the lower end and then filling the sewers and manholes with clean water to a height of 2 ft. above the top of the pipes.

"Measurements shall then be made of the rate of leakage from the sewers by determining the amount of water required to maintain a level of 2 ft. above the top of the pipe.

"Leakage *from* the sewers under test shall not exceed the requirements for leakage *into* sewers as specified heretofore.

"The Contractor shall construct such weirs or other means of measurement as may be required, shall furnish water and shall do all necessary pumping to enable the tests to be made properly.

"Portions of sewers which fail to meet tests shall be repaired and retested as necessary without additional compensation until test requirements are met." [Pl.Ex. 1, pp. B38–SD–48, 49]

"CHEMICAL STONEWARE PIPE AND FITTINGS

"*Section 16.1 General.* The Contractor shall furnish all materials, labor, and equipment required to construct and test sewers as indicated on the drawings and as herein specified.

"The Contractor shall make careful inspections of all pipe and fittings before they are incorporated into the finished work and shall immediately remove from the work all pipe which is found to be damaged or does not conform to the specifications. The Engineer shall make such additional inspections as he may deem necessary.

"Chemical stoneware sewers shall be laid on a Class B corrosion-resistant concrete cradle.

"*Section 16.2 Chemical Stoneware Sewer Pipe and Fittings.* Chemical Stoneware sewer pipe and fittings shall be equal to U. S. Standard Chemical Stoneware, manufactured by U. S. Stoneware Co., or Knightware Chemical Stoneware manufactured by Maurice A. Knight, both of Akron, Ohio.

"*Section 16.3 Handling and Cutting.* The Contractor's attention is directed to the fact that chemical stoneware pipe and fittings are comparatively brittle. Care shall be taken in handling and laying the pipe and fittings to avoid damaging them.

"Cutting of pipe shall be done by a power-driven carborundum wheel or other approved means. No cutting shall be done with hammer and chisel, except to prepare a groove prior to mechanical cutting as specified above.

"*Section 16.4 Laying and Jointing.* No defective pipe or fitting shall be installed in the work and any piece found to be defective after having been laid shall be removed and replaced by a sound piece at the Contractor's expense.

"Pipe shall be laid to conform to the lines and grades indicated on the drawings and shall be cleaned of all foreign matter before being laid and maintained

Fanning & Doorley, on or about July 31, 1959, submitted its bid on a unit price basis using the form set forth in the Book. In this form of bid, units and quantities of work of different kinds were estimated and a price submitted for each. Fanning & Doorley's bid on the units estimated in the Book totaled $204,-147.50. The prescribed contract was executed on August 28, 1959, by the appropriate officers of Fanning & Doorley and Geigy. At the same time a "Supplemental Agreement" was also signed and made part of the Book, which provided, among other things, that Fanning &

Doorley would be paid on the basis of its cost plus 15%, but that the total amount payable would not exceed the total amount computed by using the prices stipulated in the proposal. In other words, this was a cost plus contract with a top or upset limit. Also, on August 28, 1959, a performance bond was executed by Fanning & Doorley, as principal, and The American Insurance Company, as surety, the latter being a defendant to Geigy's counterclaim in this action.

Following the signing of the contract, the work was scheduled to commence on September 21, 1959 and be completed by

clean until accepted in the completed work.

"Care shall be taken to preclude any movement of the pipe from the established line and grade when placing the concrete cradle. Particular care shall be given to prevent 'floating' of the pipe.

"Except as hereinafter specified, the pipe shall be jointed with asbestos-rope calking and Causplit Mortar made by Pennsalt Chemicals Corp., Philadelphia, Pa. The Contractor's attention is directed to the fact that Causplit is a phenol-formaldehyde type resin and that some persons are allergic to such materials. Causplit shall at all times be handled and joints shall be made in accordance with the recommendations of the manufacturer and extreme care shall be taken in its use to avoid any possible damage.

"Expansion joints shall be made, as indicated on the drawings, with asbestos-rope calking and a plasticized epoxy similar to Coroline E manufactured by the Ceilcote Co., Cleveland Ohio.

"After the pipe has been laid and jointed but before the concrete cradle is placed, all areas of the pipe that would otherwise be in contact with the concrete shall be covered with a bituminous impregnated felt to ensure that no bond will exist between the pipe and the cradle.

"*Section 16.5 Temporary Plugs.* Temporary plugs shall be used as specified under VITRIFIED CLAY SEWER PIPE AND FITTINGS.

"*Section 16.6 Leakage.* Leakage allowances shall be as specified under VITRIFIED CLAY SEWER PIPE AND FITTINGS." [Pl.Ex. 1, pp. B38–SD–50, 51]

"Earth Excavation and Backfill * *

"The unit prices for Items 1a and 1b shall constitute full compensation for earth excavation, backfill, and disposal of surplus material. They shall also include compensation for the following:

"1. All labor, materials, and labor for handling trench drainage; relocating existing piping as required; removal and replacement of minor structures and equipment such as isolated concrete pads, retaining walls, stairs, fences; and removal and disposal of abandoned piping and structures, as required, and plugging all open ends with brick or concrete masonry to a depth of 9 in.; all as indicated on the drawings.

"2. Handling of plant sanitary and industrial wastes flows in a satisfactory manner and as coordinated with the Owner; and handling surface water drainage from Lyndon Road if required during construction work.

"3. Removal of pavement and pavement bases encountered." [Pl.Ex. 1, p. B38–SD–102]

On the same date that the "Contract" was executed, August 28, 1959, the parties executed a "Supplemental Agreement to Contract Agreement" which provided,

"2. The work to be done under the contract for Construction of Drainage and Water Systems and Appurtenant Work, Contract 1952–2, shall be done for the reasonable cost of said work plus a percentage of such cost all as defined in Article XXIX, Extra Work of the Contract Agreement as herein modified, provided, however, that should the amount so computed exceed the total amount computed by using the prices stipulated in the Proposal submitted by the Contractor, then the latter shall govern." (Pl.Ex. 1)

February 24, 1960, the end of the 180-day specified contract period.

The specifications for the chemical stoneware pipe provided in pertinent part as follows:

"Except as hereinafter specified, the pipe shall be jointed with asbestos-rope calking and Causplit Mortar made by Pennsalt Chemicals Corp., Philadelphia, Pa. The Contractor's attention is directed to the fact that Causplit is a phenol-formaldehyde type resin and that some persons are allergic to such materials. Causplit shall at all times be handled and joints shall be made in accordance with the recommendations of the manufacturer and extreme care shall be taken in its use to avoid any possible damage.

"Expansion joints shall be made, as indicated on the drawings, with asbestos-rope calking and a plasticized epoxy similar to Coroline E manufactured by the Ceilcote Co., Cleveland, Ohio.

"After the pipe has been laid and jointed but before the concrete cradle is placed, all areas of the pipe that would otherwise be in contact with the concrete shall be covered with a bituminous impregnated felt to ensure that no bond will exist between the pipe and the cradle." (See fn. 1—Sec. 16.4)

In addition, there was a provision that the sewers and manholes had to meet certain leakage test requirements and that:

"Portions of sewers which fail to meet tests shall be repaired and re-tested as necessary without additional compensation until test requirements are met." (See fn. 1—Sec. 15.8)

The supervision of the execution of the contract was vested in the Engineer (Metcalf & Eddy), and it provided in Article III that the Engineer would in all cases determine the amount, quality, acceptability, and fitness of the work, and further that in the event that a determination or decision of the Engineer was questioned by the Contractor, the decision of the Engineer would be a condition precedent to the Contractor's right to receive any money for the work to which

the question or difference in opinion related. Article II provided that the Contractor would do all the work and everything necessary for performance and completion as required by the contract in the manner and within the time specified, and that the entire work be completed to the satisfaction of the Engineer. In Article XXIV it was further provided:

"If the work or any part thereof shall be found defective at any time before the final acceptance of the whole work, the Contractor shall forthwith make good such defect in a manner satisfactory to the Engineer * * * *"

Fanning & Doorley started work under the contract in the latter part of September, 1959. During the time that followed, Metcalf & Eddy, on the authority of Geigy, issued twelve (12) written supplemental agreements, so-called, which provided in some cases for extra work or a redesign of work, and in other cases for a deletion of work. The defendant contends that the major item not completed by July 1960 was the chemical stoneware system and argued this item was crucial and it was apparent that Fanning & Doorley did not complete and was not going to complete this requirement. (On post trial arguments, counsel for defendant did not deem it significant to consider manhole leakage. As a consequence, this court will not concern itself with the leakage failures of the same).

Fanning & Doorley commenced laying the chemical stoneware pipe and making Causplit joints on or about December 1, 1959. Although it had no prior experience in this particular kind of work and did not make contact with the manufacturer, nor make at the outset a test joint to determine the performance of the material, it did seek guidance from the defendant and was informed by it that the work would be under the direction of the resident engineer of Metcalf & Eddy. When the first joint was made, it was done under the supervision and direction of John Elwood, said resident engineer who mixed the material and either assisted or troweled it into the joint. Mr. Elwood testified that thereafter the recom-

mendations and orders or suggested changes of the manufacturer were carried out at all times by the plaintiff; that the joints were made under his supervision with weekly reports being sent to Mr. Podger. It is significant to note he also stated that the backfilling of the trenches in which the pipe was laid was at either his direction or that of his superiors, Mr. Podger or Mr. Aubin, the plant manager, or a combination of them. All joints made up to March 23, 1960, a significant date as will hereinafter be noted, failed to pass leakage tests.

The daily history of the use of Causplit mortar as testified to by Mr. John Elwood and as reflected in the exhibits logging each day's activities, develops a series of trial and error methods showing a lack of the required specific knowledge as to its proper use procedures and application on the part of the defendant's engineers and the manufacturer of Causplit.

It would be inappropriate for this court to detail over three thousand pages of testimony in support of each of its findings. However, certain significant points should be noted. Starting in December of 1959, Fanning & Doorley followed the directions and recommendations made to them as to the application of Causplit mortar. All that they did was supervised and documented by the defendant's own resident engineer who, as leakages occurred in the various joints and difficulties were encountered, directed new and different procedures. Part of this recorded history shows the following various changing procedures directed to the plaintiff and carried out by it: on December 1, 1959 simple troweling was employed; December 18, 1959 —because of the water condition, the drying of pipes and application of heat was directed by the defendant; December 21, 1959—the cradling of pipe with concrete, coating it with asphalt and piping of heat was directed by the defendant—this was further modified to some degree on December 22; December 31, 1959—the manufacturer replaced the Causplit mortar with one having a faster setting in-

gredient and recommended the use of space heaters; January 13, 1960—a representative of the manufacturer suggested more powder be added to the mix to increase the setting time and that sulphur cement be poured around the Causplit—it was understood that this would eliminate the need of pumping out the wet trenches and the application of heat to the pipes to cure the mortar; January 25, 1960—the plaintiff received the reprocessed mortar and started applying it; February 1, 1960—to overcome difficulty keeping the mortar in the joints, the manufacturer suggested placing dry ice under the mortar pan; February 2, 1960—a representative of Pennsalt, the manufacturer, again called at the job site and directed the making of a sample joint—in doing so, he found that the mortar wasn't workable, it slumped out of the joint whereupon the defendant again changed the procedures. This time it was as to the calking, following which the mortar seemed to work; February 26, 1960—a representative of Pennsalt again came to the job site and tested the joint made under their direction and supervision and found the leakage exceeded their specification requirements.

In March, 1960, the very joint made by the manufacturer had an even greater percentage of leakage. On the 10th of this same month, Metcalf & Eddy, through John Podger, the project engineer, instructed Fanning & Doorley to stop laying the chemical stoneware sewer and had Mr. Douglas Woolley, a factory representative of Pennsalt, come to the job site. Employing new techniques, he finally devised a procedure for making leak-free joints. Part of this new technique was the use of different calking material. It was at this point that a successful method of making leakproof joints was first devised and demonstrated to Fanning & Doorley. It must be noted, however, that even this joint made under Mr. Woolley's supervision had void spaces in the top part and as Mr. Elwood testified, this indicated the leakage was being prevented by the asbestos rope which had to be purchased from specified

manufacturers other than Pennsalt—that is, a new material for calking not heretofore specified for Fanning & Doorley.

In connection with this testimony, the court must look to the contract for the original specifications set forth therein and the contract obligation of the plaintiff.

Section 16.4 (quoted in fn. 1) is written in positive terms with absolute requirement that asbestos rope calking and Causplit mortar made by Pennsalt be used in making chemical stoneware pipe joints. This is different from the specification requirements for every other type of joint where a degree of discretion is permitted. It must be noted that this section also has the mandatory provision that the joints "* * * *shall* be made in accordance with the recommendations of the manufacturer * *" (italics added).

It can hardly be said that the plaintiff should be held responsible for leaking joints caused by the use of Causplit mortar as recommended by the manufacturer.

The defendant argues that the plaintiff's work was defective in that, among other things, certain pipes were cracked, void spaces were found in the mortar of many joints, improper calking and fitting of the pipes. This is not acceptable as proof of poor workmanship or as a contributing cause of the leakage. The testimony shows that the cracks may well have been caused by a backhoe which was equipment used by the defendant in excavating the ground to expose the pipes for inspection or improper grades as set by the defendant's engineer and as to the void spaces, the manufacturer itself could not prevent this as evidenced by the very joint it made.

The defendant introduced oral testimony of a calking iron being found in a joint of a 12-inch line. It seems strange that this evidence, documented by photographs to show poor workmanship, did not reveal to the satisfaction of this court any such tool. In short, evidence of poor workmanship in the laying of pipes up to March is not convincing.

I find it difficult to attribute the quality of the work as to void spaces and lack of calking to Fanning & Doorley—these very faults were proven to be attributable to the inherent failure of the materials and procedures imposed on the plaintiff. Nor can this court attach any significance to the defendant's assertion that the plaintiff prematurely backfilled the trenches after the pipes had been jointed and permitted their use for disposal of chemical waste. The short answer to this is that the order to do so was solely in the defendant's engineer and the owner to the exclusion of the contractor.

This court finds that: A) all joints made up to March, when Mr. Woolley finally devised the procedure for making a leakproof joint, were made by the contractor following the specifications and in strict accordance with the directions and orders and recommendations of the engineer and the manufacturer; B) that up to March, 1960 it was not possible to make a tight joint following the procedures and directions theretofore specified; C) that the specifications required the contractor to do work in a manner and to a degree which could not produce the desired result as originally written insofar as the chemical stoneware system for the disposal of industrial wastes was concerned. The specification requirements and all specific directions, recommendations and orders prior to March 23, 1960 were defective, inadequate and faulty.

It must now be determined whether or not all pipes laid after this date in March were satisfactory and passed the tests.

From March 23, 1960 on, Fanning & Doorley laid a total of 318 feet being 163 feet of 15-inch pipe from the point designated 15 to 16; 61 feet of 6-inch and 8-inch pipe from 16 in location of building 16 and to building 2; 44 feet of 10-inch pipe from 15 to 19; and 50 feet of all other pipe in and about the 19 area of buildings 5 and 8.

On June 22, 1960, Metcalf & Eddy forwarded a so-called "Punch List" to Fanning & Doorley. This was a letter

setting forth by number, eleven items to be completed by the plaintiff, one of which (No. 11) asked that the plaintiff, "repair and re-test" unacceptable sewers. The other ten items are not significant as they were either completed or in the process. The plaintiff did not comply.

The Fanning & Doorley contract was terminated by Geigy as will be discussed hereinafter. Following this termination, Geigy contracted with Capaldi Bros. Corporation on July 29, 1960 to complete the work. The testimony as developed by the defendant during the trial showed that Capaldi determined that the repair process would be very time consuming and uneconomical. A comparison of costs to repair the chemical stoneware or to remove and replace the same was made and it was concluded that it would be less costly to replace the entire defective lines. Pursuant to this determination after testing, pipes were replaced with minor exceptions, as follows:

All of the 24-inch pipe from the outfall to manhole 11 with the exception of one length of pipe; all of the 24-inch from 11 to 12 with the exception of one length of pipe; all of the 12-inch from 12 to 13 except for the pipe chimney east of building 11; all of the 12-inch from 13 to the still; all of the 8-inch from 13 to 14 and that portion of the 6-inch from a point north of 13 to the tank form.

The court has detailed the exact pipe replaced to determine if any was of the lines laid after March 23. The answer as found in the record is that all pipes laid after this March date were not touched and so it must be concluded they were satisfactory and accepted as such by the defendant. This the court finds as a fact.

### Termination of Fanning & Doorley by Geigy

The last work by Fanning & Doorley on the chemical stoneware sewers was on June 8, 1960. On July 5, 1960, Metcalf & Eddy wrote to the plaintiff asking for assurance of satisfactory progress by July 8, 1960. No answer was received and on the following Monday, July 11, 1960, Mr. Podger phoned the plaintiff and was informed it was not going to do any further work on the industrial waste lines. By letter of July 12, 1960, pursuant to Article XXXIII of the contract, Geigy notified the plaintiff to discontinue work and thereby terminated the contract.

In spite of the contract provisions requiring that portions of the sewers which fail to meet test requirements shall be repaired and re-tested as necessary without additional compensation until test requirements were met (Sec. 15.8 see fn. 1) the plaintiff disclaimed all responsibility for the industrial waste sewers because Causplit mortar was not a proper material and because of the impossibility of making tight joints with the same.

At the time of termination of the contract, there remained to be completed the following items:

Item 16—Fence—$29.06
Item 17—Mud Valve Stems—$200.00
Item 19—B.P.S. 5%—$775.00 [2]

### Damages

■ It is the opinion of this court and it so finds, that the 180-day period specified in the contract was waived by the parties and the delays, if any, cannot be attributed to the plaintiff. The very factual aspects of the case pointing up the legion of problems encountered with the resultant conduct of the parties speaks for itself.

■ Premised on the findings of fact made by this court, it must be and it is concluded that the plaintiff substantially performed its contract. The conclusions of law hereinafter detailed entitles Fan-

---

2. See Exhibit F for the defendant. "Note on July 11, 1960 the following work had not been completed by Fanning & Doorley

Item 16—Fence ............$ 29.06
Item 17—Mud Valve Stems .. 200.00
Item 19—B.P.S. 5% ........ 775.00
                          $1,004.06

ning & Doorley Construction Co., Inc. to recover thereunder.

A computation of damages first requires a determination of an opening figure, that is, the contract upset price. The defendant contends and the court so finds that the upset limit of the contract was in the amount of $204,147.50.

The court will now make a legal determination and factual analysis of items claimed by Fanning & Doorley as proven charges for excess lumber amounting to $10,845.00 and excess gravel in the sum of $3,450.00; excess cost breakdown of $65,707.15 and research and development costs of $4,405.95.

### Excess Lumber—Excess Gravel

■ The plaintiff rests squarely on Exhibits 86 and F in support of its position that the amounts reflected in its invoices show an overrun and are, therefore, proper additional charges to support its claim for additional lumber and gravel. The evidence sets forth a purchase of 61,728 feet as against 7,500 feet included in the contract upset limit of $204,147.50.

The plaintiff's position as to excess gravel is similarly founded in purchases of 790 cubic yards as against the contract terms providing for 100 cubic yards.

The defendant disputes this not by challenging the plaintiff's exhibit but rather by relying on specific provisions of the contract. Attention must be focused on Section 27.24 of the contract which reads in part as follows:

"Item 24—Lumber Left in Place. If lumber is left in pace (sic, should read "place") by written order of the Engineer as specified under EARTH EXCAVATION AND BACKFILL, AND GRADING or indicated on the drawings the Contractor shall be paid therefor under Item 23 (sic, should read "24").

"The lumber to be measured for payment under Item 23 (sic, should read "24") shall be ONLY that left in place as above specified.

"No measurement shall be made for lumber used for sheeting, bracing, and cofferdamming which shall be removed from the excavations, or lumber which shall be left in place at the option of the Contractor; it being understood and agreed that compensation for all such lumber, and for the cost of furnishing, placing, cutting, and removal thereof, is included in the prices to be paid for the items of earth and rock excavation." (Pl.Ex. 1, p. B38–SD–112)

Section 27.6 of the contract reads:

"Item 5—Screened-Gravel Backfill. The quantity of screened-gravel backfill to be measured for payment under Item 5 shall be the same as the number of cubic yards of authorized excavation below normal grade which said gravel replaces, or the actual quantity of gravel, measured in place, furnished and placed for miscellaneous purposes as directed by the Engineer * * *

"Screened gravel used in connection with underdrains, for bedding pipe, or to backfill unauthorized excavations shall not be measured for payment." (Pl.Ex.1, p. B38–SD–104)

Specifications—sections 27.10 and 27.-12 also provide that the unit prices for the items therein referred to shall be full compensation for furnishing and placing screened gravel cradle, among other things. (Pl.Ex. 1, pp. B38–SD–106, 107)

Thus the screened gravel which is properly to be measured for payment under Item 5, is only that gravel used in specified cases. Screened gravel was obviously used in other instances where it would not be measured for payment under Item No. 5. In those instances, it would be paid for under the other items involved. Item No. 5 provided for payment for screened gravel used for miscellaneous purposes as directed by the Engineer. In addition, the screened gravel purchased by Fanning & Doorley as allegedly reflected on the invoices of plaintiff's Exhibit 86 could have been used for other purposes at the option

of the contractor, which uses would not be covered by Item No. 5.

Item numbers of Exhibit F correspond with item numbers on the proposal. It is evident the quantity of lumber specified in Item 24 of Exhibit F would not be identical to the total amount of lumber purchased by Fanning & Doorley and the plaintiff's claim for an additional overrun of lumber is not founded in the evidence. It is also apparent the amount of screened gravel purchased by the defendant would not be identical to the amount indicated in Item No. 5 of Exhibit F. Proof as to this claim is also lacking in the evidence. The calculations on Exhibit F as to the amount Fanning & Doorley was entitled to under the contract must be accepted as accurate in the absence of proof to the contrary. The claim of the plaintiff as to these items in the amount of $14,295.00 is rejected.

### Excess Cost Breakdown and Research and Development

The plaintiff seeks the additional sum of $65,707.15 as excess costs breakdown and $4,405.95 for research and development. These sums are for 25 items listed in plaintiff's answer to interrogatories. All, excepting $1,669.27, were included in the monthly invoices submitted for this job.

The defendant contends this addition is improper as a matter of law, fact and also for lack of proper proof. As to the $65,707.15 claim, there is little merit to such fact and proof contention. In the trial of this issue before the court, the evidence was permitted as an offer of proof which was accepted as to the interrogatories and attached exhibits. All matter presented in said offer of proof was accepted as full evidence "without any conditions attached thereto." [3] This was so ruled after a lengthy and detailed discussion by the court. It pointed out the law which ruled admissibility and it further recalled the substantial testimony of various witnesses and opportunity for full examination already in the record as it pertained to these 25 items in the interrogatories.

The proof is substantial and if any basis does exist for the rejection of this claim, it must be as a matter of law.

True, the evidence clearly shows the express terms of the contract were not complied with.[4] Mr. Keane knew of its provisions requiring an order in writing. However, discussions were had between him and Mr. Elwood as to each extra item of work as it arose. Now, it is also true that though invoices were submitted by the plaintiff, they were not done as costs for extra work. However, it is unmistakable that Mr. Elwood was well aware of the extra work—he directed that it be done. Furthermore, it cannot be disregarded that a meeting was held on May 3, 1960 between the plaintiff and representatives of the defendant. A wide range of discussion took place there including the extra work and its costs. It was then decided the plaintiff would prepare a statement showing the same—this was done though there is no evidence it was in fact submitted. There is an acknowledgment of such May 3 agreement in correspondence from Mr. Podger, the defendant's project engineer, dated June 9, 1960 and introduced as part of the plaintiff's evidence (Exhibit 70).

The pertinent contract provisions were waived (as will be discussed hereinafter under Conclusions of Law) and as a

3. Transcript Vol. 6, p. 104

4. Article XXIX of the contract provides in pertinent part that: (See fn. 1 supra)
   "The Contractor shall do any work incidental to the proper completion of the contract and not otherwise provided for herein, when and as ordered in writing by the Engineer, either (a) at the price agreed upon before the work is commenced and named in the order for the work or (b), if the Engineer so elects, for the reasonable cost of said work, as determined by the Contractor and approved by the Engineer, plus a percentage of such cost, as set forth below. *No extra work shall be paid for unless specifically ordered as such in writing by the Engineer.*" (emphasis added) (Pl.Ex. 1, p. B38–C–16)

matter of law, the plaintiff is entitled to recovery of this amount.

As to the item claimed by the plaintiff in the amount of $4,405.95 for research and development there is no record in the evidence to substantiate this other than a blanket statement by Mr. Keane. This is rejected for lack of sufficient proof.

The end result of the evidence shows:

| | |
|---|---|
| Contract Upset Price | $204,147.50 |
| Deletions [5] | 12,015.00 |
| Upset limit | $192,132.50 |
| Charges for Supplemental Work (not denied) | 20,826.03 |
| | $212,958.53 |
| Inventory Items [6] | 4,054.16 |
| | $217,012.69 |
| Excess Costs | 65,707.15 |
| | $282,719.84 |
| Payments Made | 178,301.47 |
| | $104,418.37 |
| Unfinished Work (undisputed) | 1,004.06 |
| Balance due | $103,414.31 |

———————◆————

In addition, the plaintiff seeks nine years interest at 6% per annum to July 31, 1969. To award such an amount would be an unjust levy against the defendant. This court must take cognizance of the fact that the delay in the disposition of the instant matter was due to an overcrowded calendar at a time when there was a single judge assigned to this court faced with an impossible work load. Nor can this court ignore the fact that the delay in ren-

---

5. Deletions undisputed and conceded—Supplemental agreement number 7 eliminates items

| | |
|---|---|
| 14b | $ 4,340.00 |
| 14c | 1,500.00 |
| 2b | 600.00 |
| 2c | 900.00 |
| 6b | 500.00 |
| 6d | 1,000.00 |
| 6e | 325.00 |
| 6g | 1,000.00 |
| 8a | 950.00 |
| 13b | 900.00 |
| | $12,015.00 |

6. The defendant does not dispute this item but rather urges it be denied by virtue of Article XXXIII of the contract providing that upon termination of the contractor, the owner may complete the work and take possession of and use any of the materials found at the work site.

This is not applicable to the case at bar which termination was without fault of the contractor.

The contract further provides in Article III that:

"If the Contractor considers any work demanded of him to be outside the requirements of the Contract  *  *  * he shall immediately, upon such work being demanded  *  *  * ask for instructions.  *  *  * Within 10 days after receipt of the written instructions  *  *  * the Contractor may file a written protest with the Owner stating clearly and in detail his objections, the reasons therefor, and the nature and amount of damages which the Engineer's decision will cost him  *  *  * Unless the Contractor shall file such written protest with the Owner within 10 days, he shall be determined to have waived all grounds for such protest and for such damages and to have accepted the instructions  *  *  * of the Engineer as just and reasonable and as being within the scope of the Contractor's obligations under the Contract." (Pl.Ex. 1, p. B38–C–5)

dering this opinion was due to the mutual desire of counsel to have a transcript of the proceedings which ended on February 9, 1967. The plaintiff was equally as anxious as the defendant for such record. A chain of circumstances then followed, namely, continued court presence for trials, which made it virtually impossible to complete this voluminous transcript before December 12, 1968. From and after this date, there was a further delay for briefs from respective counsel.

■ Interest as an element of damages is not a matter of right to be applied through an arbitrary rule at the expense of justice. This must be determined in the light of the facts surrounding the case. Where the judgment is long delayed because of facts beyond the control of the defendant or through mutual agreement of the parties, it can only be determined by the court in the exercise of its sound discretion.[7]

■ In view of all the facts and circumstances, it is the opinion of this court that an award of interest against the defendant should cover only that period of time from the commencement of this action on July 22, 1963 to February 9, 1967, the date of termination of the trial. Anything more would be an injustice. The rate of interest is to be computed at 6% per annum.

### Conclusions of Law

*Waiver by the Defendant of the Contract Provisions Relative to Fanning & Doorley Claims for Extra Work and for Delays and Unforeseen Difficulties*

In Clark v. West, 193 N.Y. 349, 86 N.E. 1 at p. 5, the court said:

"The cases which present the most familiar phases of the doctrine of waiver are those which have arisen out of litigation over insurance policies * * *, but it is a doctrine of general application which is confined to no particular class of cases. A waiver has been defined to be an intentional relinquishment of a known right. * * * and this definition is supported by many cases in this and other states. In the recent case of Draper v. Oswego Co. Fire R. Ass'n, 190 N.Y. 12, 16, 82 N.E. 755, Chief Judge Cullen, in speaking for the court upon this subject, said: 'While that doctrine and the doctrine of equitable estoppel are often confused in insurance litigation, there is a clear distinction between the two. A *'waiver' is the voluntary abandonment or relinquishment* by a party *of some right or advantage.* * * * The doctrine of *equitable* estoppel, or estoppel in pais, *is that a party may be precluded by his acts and conduct from asserting a right to the detriment of another party* who, entitled to *rely on such conduct, has acted upon it.'* " (italics added)

In considering this question in United States of America for the use of David L. Brewer v. Acme Missiles & Construction Corporation and Continental Casualty Company (C.A. No. 3335), this court said:

"Waiver is a tortuous area of the law used in direct relation to the facts at issue. It can be said, 'the most frequent, common and generally accepted definition is that waiver is the intentional relinquishment of a known right, or the voluntary relinquishment of a known right or conduct such as warrants an inference of the relinquishment of a known right; it involves the voluntary relinquishment of some known right which is at the time available.'

"It requires a waiving and receiving party of a right intended to so operate by each of them." [8]

---

7. 25 C.J.S. Damages § 51 p. 790

8. 92 C.J.S. Waiver p. 1041; Clark v. West, 193 N.Y. 349, 86 N.E. 1, 5; Harris &

Harris Construction Co. v. Crain and Denbo, Inc., 256 N.C. 110, 123 S.E.2d 590, 596, 597; United States for Use and Benefit of Lichter v. Henke Const.

In this case, both the terms of the contract and the conduct of the parties in relation thereto must be considered in coming to an ultimate determination of this question.

The defendant rests primarily on Article XXIX providing that extra work, to be paid for, must be specifically ordered in writing by the engineer and Article III providing for a written protest by the contractor to preclude a waiver of the claim.

However specific the terms of these provisions may be, case law has established they can be dispensed with in various ways.[9]

There was continued performance of the work with the full knowledge and at the direction of the defendant through its resident engineer. As stated in the findings of fact, discussions were had between Mr. Keane and Mr. Elwood as to this very point. The plaintiff was ordered to continue and each month it was invoiced and billed. Mr. Elwood, the defendant's engineer, directed this work and at a meeting between the plaintiff and the defendant's representatives where, among other things, extra work and costs were discussed, the defendant did not rest on the contract provisions but rather acknowledged the fact of its accomplishment. This is evidenced in its request that a statement be prepared showing the same. In other words, it was a question of proof as to what was done to establish a basis for payment and not a denial of liability.

█ Conduct of a contractee clearly evidencing an acceptance of extra work by a contractor coupled with an inference of payment is a clear waiver of express contract provisions to the contrary.

It can even be said that the plaintiff may well invoke the doctrine of equitable estoppel for the evidence sustains this position. The plaintiff has shown that the defendant conducted itself in a par-

ticular manner—directing that the extra work be done—and now attempts to assume a position inconsistent with such conduct, thus prejudicing the plaintiff who acted in reliance on the defendant's original position. The magnitude of the amount involved emphasizes the strength of the plaintiff's position.

### Performance of the Contract by Fanning & Doorley

As has been stated by the court, the detailed specifications of the contract required in specific and mandatory language that Causplit mortar be used in order to join sections of the sewerage piping. Furthermore, recommendations of the manufacturer both oral and written as to the correctness of the method of application of Causplit were required to be followed. And, day-to-day technique for the application of Causplit was supervised in large part by the defendant's engineers, as also outlined in the contract. The court has found that all the contract requirements for application of Causplit, as well as all the manufacturer's recommendations for the application of Causplit were sought to be followed and were in fact followed by the plaintiff. Moreover, there has been no showing of defective workmanship on the part of the plaintiff and no warranty of the plans and specifications has been made by the plaintiff.

█ The primary source of the law in the area of consensual relationships is the agreement of the parties. If that agreement unambiguously applies to the particular problem to be decided, then the court need look no further. The defendant in the instant case argues that the contract language required plaintiff to complete the sewerage system work to meet the leakage requirements of the contract *regardless* of the defects of the plans and specifications. However, that general rule of contract interpretation by which specific language

Co., 8 Cir., 157 F.2d 13; Clark v. West, 193 N.Y. 349, 86 N.E. 1.

9. Corbin on Contracts 3A Sec. 756, p. 505

controls its general counterpart operates against the defendant. As the Supreme Court has made clear, the specific language of a construction contract, which sets out methods and materials to be used by a contractor is not controlled by " * * * the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work." Nor is specific language " * * * overcome by the general clauses requiring the contractor to * * * assume responsibility for the work until completion and acceptance.[10]

Given the imprecision of the language of the contract, the issue is one of law. To borrow from a more eloquent source:

> "If we view the law of contract as directed to strengthening the security of transactions by enabling men to rely more fully on promises, we see only one phase of its actual workings. The other phase is the determination of the rights of the contracting parties as to contingencies that they have not foreseen, and for which they have not provided. In this latter respect the law of contract is a way of enforcing some kind of distributive justice within the legal system * * * the essential problem of the law of contract is the problem of distribution of risks."[11]

The issue, then, is one of distribution of the financial risks created by the failure of Causplit mortar to effectuate its purpose when applied substantially in accordance with the contract plans and specifications, the manufacturer's recommendations, and the engineer's suggestions. For several reasons, this court places that risk, in this controversy between contractor and owner, on the owner. First, the plans and specifications were mandatory as to Causplit and

did not permit any substitution of equivalents as they did in the case of other materials used. Hence, to have deviated from the Causplit requirements would have opened the plaintiff up to a breach of the specifications. Second, the contract was drawn by the owner who controlled its language and who impliedly warranted Causplit's fitness for this purpose by requiring it to be used. Third, it would appear to be the majority rule that

> " * * * a construction contractor who has followed plans or specifications furnished by the contractee, his architect or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results, at least after the work is completed, solely from the defective or insufficient plans or specifications, in the absence of any negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects."[12]

Fourth, in the absence of controlling authority in this jurisdiction, the court is strongly persuaded by a decision of the United States Supreme Court in extremely analogous circumstances. In United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), the Court held that the requirement, in a contract for the building of a drydock, that the contractor should relocate a sewer which ran through the construction area, in accordance with plans and specifications furnished by the government, which prescribed the shape, material, and location of the sewer section to be substituted, carried with it a warranty that the sewer would be adequate. The Court concluded that a contractor who is obliged to build according to plans and specifications pre-

---

10. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)

11. Cohen, "The Basis of Contract" from Law and the Social Order (1935)

12. Annotation: Construction Contractor's Liability to Contractee for Defects on Insufficiency of Work Attributable to the Latter's Plans and Specifications, 6 ALR 3rd 1394 at 1397 (1966) and cases cited therein.

pared by the owner is not responsible for the consequences of defects in those plans and specifications.[13] Fifth and finally, this distribution of the risk comports with the general usage of the construction industry.[14]

The effect of such a rule of law on the claims in the instant case is clear; it operates as an excuse for the plaintiff's failure to repair the leaking joints and therefore mandates the conclusion that the plaintiff did, indeed, substantially perform its obligations under the contract and is therefore entitled to payment; further, it provides a full and complete defense to defendant's counterclaim of abandonment and delay. Apart from certain trivia, the only work not done by plaintiff as of the date it left the job was the leakage repair work from which it was legally excused. Additionally, virtually all the delay on the job is attributable to the trial and error adjustment that was necessitated by the Causplit problem.

In sum, the rule of law previously articulated constitutes the basis for both the plaintiff's claim for payment and its defense to the counterclaims of delay and abandonment.

The counterclaim of the defendant, Geigy Chemical Corporation, for the reasons stated in this opinion is hereby denied and The American Insurance Company is hereby relieved from all liability as defendant to said counterclaim.

It is hereby ordered that judgment be entered for the plaintiff in the sum of $103,414.31 plus interest for that period of time and at the interest rate hereinbefore specified.[15]

---

13. Ridley Investment Co. v. Croll, 192 A.2d 925, 6 A.L.R.3d 1389 (Del.1963); Fuchs v. Parsons Const. Co., 172 Neb. 719, 111 N.W.2d 727 (1964); Blue Bell, Inc. v. Cassidy, 200 F.Supp. 443 (N.D.Miss. 1961). See generally 6 Corbin Contracts sec. 1338 at p. 394 (1962)

14. AIA, The General Conditions of the Contract for the Construction of Build-

ings, Article 14, American Institute of Architects (1963)

15. Claim against defendants Harrison P. Eddy, Jr., and Frank A. Marston, d/b/a Metcalf & Eddy, Engineers dismissed pursuant to Fed.R.Civ.P. 41(b)