RAINBOW ISLAND PRODUCTIONS, LIMITED, *v.* JAMES Y. T. LEONG AND THEODORA C. S. LEONG, dba JAMES Y. T. LEONG AGENCY, A COPARTNERSHIP.

No. 4093.

March 9, 1960.

Tsukiyama, C. J., Marumoto, Cassidy, Wirtz and Lewis, JJ.

OPINION OF THE COURT BY LEWIS, J.

Plaintiff-appellant won a verdict of $14,162 for fraudulent misrepresentation. The court ordered a new trial on the question of damages. This is an interlocutory appeal by plaintiff, duly allowed from that order.

The fraudulent misrepresentations arose from a proposal for financing an expansion of plaintiff's business through the American National Insurance Company of Galveston, Texas, herein called "the insurance company."

Defendants-appellees were engaged in an insurance agency business as copartners. Defendant James Y. T.

Leong was the general agent and mortgage loan correspondent for the insurance company. The partnership is referred to herein as "the insurance agency" or "the agency."

A representative of the agency contacted plaintiff's president, Charles E. Smouse, and upon that solicitation Mr. Smouse called at the office of the agency and discussed the expansion plan with Ricardo de Escamilla, generally referred to in the record simply as "Escamilla," who was district sales manager of the insurance company and sales manager of the insurance agency. A number of meetings ensued, chiefly with Mr. Escamilla. Misrepresentations were made as to the business and practices of the insurance company in the financing field, which need not be detailed since the liability for the fraud is not an issue here.

The proposal made to plaintiff was without authority of the insurance company, which though named in the complaint as a defendant was dismissed on motion at the end of plaintiff's case and is not a party here.

After the verdict and judgment for plaintiff, defendants moved for a new trial. This motion in part was based on the excessiveness of the verdict.

Only the amount of $822.18 actual damages plus $1 nominal damages was established, according to the Decision on Motion for New Trial, entered March 3, 1958. Plaintiff was allowed twenty days in which to remit all except that amount. After hearing argument on plaintiff's motion for reconsideration of this decision the court denied it but extended the time for the remittitur to thirty days. Thereafter, plaintiff moved to have the order granting new trial limited to the damages, to which defendants agreed. The remittitur was not accepted, and on April 28, 1958 there was entered an order setting aside the verdict as to the amount of damages, and granting a new trial on the question of damages only.

Only special and general damages are involved. Punitive damages were sought but denied by the court without submission to the jury and there is no specification of error as to that.

Special and general damages were sought by the complaint as follows:

"(a) Plaintiff has suffered the loss of all amounts spent by plaintiff in attempting to carry out the expansion plan proposed by defendants. Said amounts include $822.18, spent for plaintiff's president to travel to the mainland, and $11,470.70, representing the plaintiff's overhead and expenses during such time as its business was virtually at a standstill because its president devoted practically his entire time to the proposed plan of expansion.

"(b) Plaintiff's business was damaged in that its president devoted virtually his entire time to the proposed expansion from August 1, 1955 through October 30, 1955.

"(c) Plaintiff has suffered damage to its reputation in the moving picture and television industry through being induced by defendants' misrepresentations to solicit from numerous of plaintiff's business contacts contributions of capital for a plan of expansion that proved worthless and impossible."

Plaintiff's instructions numbers 19 and 20, the latter as amended, were given by agreement as follows:

"PLAINTIFF'S INSTRUCTION NO. 19

Damages include reasonable expenses incurred by the plaintiff as the natural result of the defendants' wrongful acts."

"PLAINTIFF'S INSTRUCTION NO. 20

The interruption of a business, or an injury thereto,

by the wrongful act of another is a proper element of damage, provided, of course, it is the natural and proximate result of such act.

"If it is certain that damages of this kind have been caused by the wrongful act of the defendants, a recovery will not be denied because of uncertainty as to the amount of such damages.

"Recoverable elements of damages for injury to a business include loss of business standing, loss of customers or business, and loss of profits, if not too remote."

These instructions being the law of the case (*Gay* v. *Mendonca*, 7 Haw. 293; *Bartlett* v. *Hawaiian Carriage Mfg. Co.*, 13 Haw. 311), the question presented to the trial court was whether the verdict "appears to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion or misunderstanding of the charge of the court on the part of the jury; * * *," or whether a new trial should be granted "for any legal cause." R.L.H. 1955, § 231-22; H.R.C.P., Rule 59 (a).

As stated in *Pooler* v. *Stewarts' Pharmacies, Ltd.*, 42 Haw. 618, appellate review of the excessiveness of a verdict is limited to a consideration as to whether the trial court committed an error of law or abused its discretion in granting or denying a new trial.

That the grant of a new trial may be reversed for abuse of discretion was held in *Ahmi* v. *Cornwell*, 14 Haw. 301. However, the appellate court should have due regard for the trial court's "feel for the case." Moore, *Federal Practice*, §§ 59.05(5); 59.08(1), (5), (6); 59.15(1), (3), (2d ed.); *MacFarlane* v. *Lowell*, 9 Haw. 438; *Kaimana* v. *Kamaunu*, 11 Haw. 767; *Heleluhe* v. *Honolulu Rapid Transit & Land Co.*, 18 Haw. 481; see also *Pooler* v. *Stewarts' Pharmacies, Ltd., supra*, an appeal from a denial of a new trial. *Robinson* v. *Honolulu*

*Rapid Transit & Land Co.,* 20 Haw. 426, reh'g den. 20 Haw. 466, held that the trial court was not authorized to set aside a verdict supported by more than a scintilla of evidence. However, this case was decided before the change in our statute regarding new trial.

A clear case for affirmance of an order granting a new trial is presented when, on the law and the evidence, the jury could not find the amount awarded, since the setting aside of the verdict in such circumstances is not an abuse of discretion. *Tuck Chew* v. *Makee Sugar Co.,* 11 Haw. 453.

Here we are reviewing the setting aside of the verdict, not the amount of the remittitur. Though the acceptance of the remittitur would have eliminated the entry of the new trial order, since it was not accepted it is functus. *Swett* v. *Gray,* 141 Cal. 63, 74 Pac. 439, *cf. Nix* v. *Gulf, Mobile & Ohio R.R.,* 362 Mo. 187, 240 S.W. 2d 709. While we ourselves have power to grant a remittitur, the uncertainties in the record are such that we shall not endeavor to do so. *Tuck Chew* v. *Makee Sugar Co., supra,* at 456; see also Moore, *Federal Practice,* § 59.05(3), pp. 3749-3751 (2d ed.); 66 C.J.S., *New Trial,* § 209c(1).

Our view of the pertinent evidence is such that we find no basis for holding that the trial judge abused her discretion in granting the motion for a new trial.

The tenor of Mr. Smouse's testimony was that plaintiff was engaged in the business of producing moving pictures, this primarily was a personal service business and the services sold were his own; that the fraud induced him to devote practically his entire time to the proposed financial expansion plan; and that the nature of the business was such that while he was thus engaged plaintiff's expenditures were productive of no income. There also was evidence of knowledge on the part of Mr. Escamilla of plaintiff's situation.

As will appear, the time when plaintiff decided upon a course of action in reliance on the misrepresentations was not established, and may have been as late as October 20, 1955. On October 25, 1955, Mr. Smouse was informed by an agent of defendants concerning certain facts discovered by defendants as to Mr. Escamilla's record and concerning the severance by defendants of all relations with him. This information was sufficient to bring home to Mr. Smouse that he was "in an awful spot," and there was no further reliance on the misrepresentations beyond that point, though it is claimed by the complaint that further time was spent on the matter, i.e., through October 30, 1955.

We first consider the situation following the abandonment of the plan. Plaintiff claims to have been still affected for some months by the fraud, by reason of the actions it was induced to take before the plan was abandoned. However, there is no substantial evidence of loss of credit standing or business reputation. To the contrary, Mr. Smouse's testimony negatived such loss.

Plaintiff's theory is that it lost its momentum by reason of interruption of the business. Mr. Smouse testified that, after the financial expansion plan was dropped, "it was just like starting in business all over again," because "I had not been available to our clients that we had, and there are others who can do this work here." This conclusion, in itself, is not sufficient to sustain the verdict. Plaintiff had the burden of showing "actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn." 15 Am. Jur., *Damages*, § 157.

There is evidence from which plaintiff claims that the business grossed an average of $1982 per month from its inception to July, 1955, and only $186 per month on an average thereafter through February, 1956. The verdict

may have been based on the difference of $1796 per month times approximately seven and one half months (which would allow this difference from the first interview with Escamilla on July 18, 1955 through February, 1956), plus travel expenses of $822.

The figure of $1796 lost per month does not take cognizance of operating costs directly applicable to the gross income, which as Exhibit Q, the Annual Corporation Exhibit shows, were 40% or more of gross income, nor does it take cognizance of any other expenses. Damages could not be determined by total gross revenues in this manner. 15 Am. Jur., *Damages*, § 158; *Lockwood Grader Corp.* v. *Bockhaus*, 129 Colo. 339, 270 P. 2d 193. Moreover, the loss of business was not sufficiently established.

It was shown that during approximately two and a half years in which plaintiff had been in business prior to the contact with Mr. Escamilla, plaintiff had produced three series of television films. This business was completed. The only other business of that period was the production of two short industrial films for one firm, and a film of a national convention held here by the Shriners. Mr. Smouse testified it was contemplated at the start it might take three to five years to build up the business. It had not shown a net profit since its inception.

At the time of occurrence of the events complained of the prospects for customers were below the average on which plaintiff-appellant relies. Exhibit O, Mr. Smouse's letter of July 18, 1955 to plaintiff's principal stockholder, Mr. Vanderbilt, informed the latter that "the past few months have been exceedingly difficult for me." Reference was made to the loss of a certain account which "was like cutting our life line. The money derived from that source was our bread and butter money." There is no evidence as to when this account was lost.

According to plaintiff's annual corporation exhibit

filed with the Treasurer of the Territory for the period November 1, 1954-October 31, 1955, plaintiff's gross revenues before operating costs or overhead were $12,274.60 in that fiscal year as compared with $25,921.77 in the preceding one. Some of this was gross income of the period after the contact with Mr. Escamilla. The remainder, spread over the eight and a half months of the fiscal year preceding this event, evidences that the business already had fallen below average.

Mention was made in Exhibit O of a certain series of films, the starting of which would cure everything wrong, but which "was going to take more time than originally presumed," though a "terrific amount of time" already had been put into getting it started. There is no evidence that this potential business actually was lost as a result of an interruption during pursuit of the financial expansion plan.

The uncertainties of plaintiff's situation were such as to preclude the showing, by the mere comparison of the volume of business before and after the happenings complained of, that loss of business was caused thereby. The business was not sufficiently established. See *United Construction Workers* v. *Laburnum Construction Corp., infra;* 15 Am. Jur., *Damages,* § 157; 25 C.J.S., *Damages,* § 42b; *Sinclair Refining Co.* v. *Hamilton & Dotson,* 164 Va. 203, 178 S.E. 777. We cannot say, as in *Coney* v. *Lihue Plantation Co.,* 39 Haw. 129, 134, that "there is substantial evidence more than a mere scintilla to prove that [the events complained of were] the sole variant as the proximate cause of such difference [in gross income]."

The requirements of proof are shown by *United Construction Workers* v. *Laburnum Construction Corp.,* 194 Va. 872, 75 S.E. 2d 694, aff'd on other points 347 U.S. 656. Plaintiff construction company sought damages for disruption of its business by defendant labor unions. Liability

was established but the appellate court struck from the judgment compensatory damages for the alleged permanent destruction of plaintiff's business relationship with named coal companies and their subsidiaries, saying:

"We may assume without deciding that the evidence supports a finding that the conduct of the defendants' agents was the proximate cause of a permanent disruption of the profitable relationship between the plaintiff and these coal companies. The crucial inquiry is, does the evidence support a finding that the plaintiff is entitled to substantial damages by way of loss of profits as the result of such wrongful acts?"

\* \* \*

"\* \* \* We are not here concerned with the disruption of a business relationship involving numerous transactions with numerous customers, where the volume of future business may be estimated with reasonable certainty. On the contrary, the plaintiff had established a relationship with what was in effect a single customer, involving a relatively small number of transactions. Unlike the preceding five items of the plaintiff's damages, there is no evidence that these coal companies had promised the plaintiff any further work, or that they had definitely decided upon an additional construction program. Whether such construction work would have been undertaken by these companies, and if so, the extent thereof and what part thereof, if any, would have been awarded to the plaintiff and upon what terms, is entirely speculative and conjectural. Evidence that the plaintiff during the past preceding two years had done work for these companies at an annual profit of $25,000, standing alone, will not, we think, support a finding, as the plaintiff argues, that this situation would have continued over a period of years. In short, the plaintiff's evidence

fails to establish the amount and extent of its damage under this item with the required reasonable certainty." P. 707.

Plaintiff relies on the rule that "the law never insists upon a higher degree of certainty as to the amount of damages than the nature of the case admits." *Lum Ah Lee* v. *Ah Soong,* 16 Haw. 163; *Coney* v. *Lihue Plantation Co., Ltd., supra; Jendrusch* v. *Abbott,* 39 Haw. 506. However, that does not mean that vague inferences will suffice.

In this case there is no showing of business turned away during the pursuit of the financial expansion plan. The office was kept open while the plan was pursued "to keep our contacts and have a place to be contacted" as Mr. Smouse suggested to Mr. Vanderbilt. There is no evidence, except Mr. Smouse's unsupported conclusion, that when plaintiff resumed ordinary business its difficulties in building up its business, which already existed, were greater because the matter was not tackled until the end of October, instead of earlier. And even if there had been a factual showing of clients who went elsewhere by reason of interruption of the business, the evidence of business lost thereby would have had to be definite and specific.

Plaintiff endeavored to show "rental value" as a measure of damages. This evidence consisted in Mr. Smouse's testimony as to how much gross revenue would have been enjoyed had there been full time use of plaintiff's facilities, including personnel, at package prices. This, of course, is subject to the same objection as the computations based on the past record of gross revenues, that is, absence of proof such business would have been enjoyed but for the interruption.

The special damages sought by the complaint, consisting in $822.18 travel expenses and $11,470.70 of other expenses, were itemized by Exhibit 30, which shows that

the latter figure covered business expenses over a period of seven or seven and a half months. This is greatly in excess of the period during which the business was shown to have been affected by the fraud. We do not consider the allowability of these various items, since these special damages could not possibly support the amount of the verdict.

We now consider the damages for the period, if any, in which plaintiff, in reliance on the misrepresentations, devoted itself to the financial expansion plan. Though the jury may have found that the fraud had effect from the time of the first meeting with Mr. Escamilla, this is not supported by the record. Plaintiff did not rely on the misrepresentations to the extent of immediately bringing its ordinary business to a standstill. Of course, reliance on the misrepresentations is essential, as set out in Plaintiff's Instruction No. 16-B given by the court.

The first meeting with Mr. Escamilla was on July 18, 1955.

The first decision on the part of plaintiff's board of directors was on October 20, 1955, at which time as testified:

"Now, in this meeting we discussed this from every standpoint that we could possibly think of to decide to take a definite step in regard to really getting things rolling, and it was decided at that meeting that we would allow Mr. Escamilla to prepare this letter [a letter to prospects]."

There were only two stockholders of the company and they were in communication from time to time about the financial expansion proposal. Mr. Smouse himself was one, and the other, holding two-thirds of the stock, was George Vanderbilt. On the day of the first interview with Mr. Escamilla, July 18, 1955, Mr. Smouse wrote Mr. Vanderbilt the letter, Exhibit O, to which we have referred.

This letter discussed the proposal and recognized the necessity of Mr. Vanderbilt's approval.

It was the tenor of Mr. Smouse's testimony that Mr. Vanderbilt approved by telephone his spending all his time on the financial expansion plan. He did not assert that he was authorized to decide on that course of action without Mr. Vanderbilt's being in agreement. However, the date of the conversation in which this was agreed upon does not appear.

Mr. Vanderbilt telephoned in reply to the letter of July 18, 1955, Exhibit O, and as a result Mr. Smouse contacted an adviser of Mr. Vanderbilt's. On July 25, 1955, Mr. Smouse wrote of a meeting this adviser had on July 22 with the agency and continued:

"Due to the length of time that it takes to enter into such a proposition, there would certainly be ample opportunity to discuss it thoroughly at a Board of Directors meeting, in which there would be the opportunity to discuss all the pros and cons and vote it down, should it prove to be an unlikely course for us to take. At any rate, trust me not to rush headlong into any hairbrain schemes."

Questioned whether he ever came to a decision to proceed with the various steps involved in the expansion plan, Mr. Smouse testified:

"Yes, I'm sure that I did. It was sometime during the month of August, after discussing it and feeling that it was a substantial step to take."

On August 9, 1955 at a meeting in Mr. Escamilla's office, Mr. Smouse had told Mr. Escamilla "that I had to have some kind of an outline of the proposal so that I would have something to work with." This was mailed to him over the weekend (Exhibit 14, dated August 13, 1955) and he "actually started out on Monday, which was the 15th of August." Work done on the plan before that

time was in gathering material for the use of defendant agency, and the evidence as to this does not support the conclusion that there had been a decision reached.

Thus August 15, 1955 is the earliest possible date of the decision to drop the ordinary business. The plan was abandoned and business resumed the end of October, 1955. The continued effect of the wrongful acts after that date was not established. Plaintiff did not meet the requirements of proof of loss of business for any period involved. Accordingly, we cannot say that there was an abuse of discretion in ordering a new trial on the question of damages.

Affirmed.

*Richard E. Stifel* (*Anderson, Wrenn & Jenks* on the briefs) for plaintiff-appellant.

*J. Russell Cades* (*Smith, Wild, Beebe & Cades* on the briefs) for defendants-appellees.