**NORTHWAY DECKING & SHEET METAL CORP., a corporation**

v.

**INLAND–RYERSON CONSTRUCTION PRODUCTS COMPANY, a corporation**

and

**Dimeo Construction Company, a corporation.**

Civ. A. No. 4992.

United States District Court, D. Rhode Island.

Jan. 28, 1977.

Kaplan, Latti & Flannery, Boston, Mass., for plaintiff; Robert S. Wolfe, Boston, Mass., of counsel.

Edwards & Angell, Providence, R.I., for Inland-Ryerson; Stephen A. Fanning, Jr., Providence, R.I., of counsel.

Aisenberg & Dworkin, Providence, R.I., for Dimeo Const. Co.; Allen T. Dworkin, Providence, R.I., of counsel.

## OPINION

DAY, Senior District Judge.

This is a civil action in which the plaintiff, Northway Decking & Sheet Metal Corporation (hereinafter "Northway") sues Inland-Ryerson Construction Products Company (hereinafter "Inland") for breach of a construction subcontract and for the value of certain extra work it allegedly performed. Northway also sues Dimeo Construction Company (hereinafter "Dimeo") for tortious interference with the business and contractual relationship existing between Northway and Inland. The complaint prays for both equitable relief and legal damages. Dimeo has filed a cross-claim against Inland and Inland has counterclaimed for damages against Northway. Jurisdiction is based upon diversity of citizenship and the existence of a controversy in the requisite amount. 28 U.S.C. § 1332(a)(1).

On August 18, 1972, this Court denied the plaintiff's request for a preliminary mandatory injunction permitting removal of certain unique hanging scaffolding from the Civic Center construction site. Thereafter the matter came on for trial of the claims for damages only, the claim for permanent injunctive relief having become moot.

The evidence adduced at the trial established that on January 25, 1971, Dimeo and the Providence Civic Center Authority entered into a formal written contract for construction of the Civic Center in downtown Providence. The building was to be constructed by September 25, 1972, with a liquidated damages clause calling for a $250.00 assessment against Dimeo per day for delay beyond that date.

On April 6, 1971, Inland and Dimeo entered into a formal written subcontract confirming an oral agreement of March 25, 1971, for the supply and erection of steel roof deck and siding for the Civic Center. Inland, in turn, subcontracted with a certain Phelps Steel, Inc. (hereinafter "Phelps") on September 7, 1971, to erect said roofing and siding. Inland was to supply erection materials.

On October 13, 1971, Phelps and Northway formalized a subcontract whereby Northway would provide the labor required for said erection for the sum of $120,500. Northway entered into a new written erection subcontract directly with Inland on March 20, 1972 and, four days later, Phelps assigned its original erection subcontract with Inland to Northway. Inland agreed to pay Northway the sum of $132,400.00 for erection services.

Inland ordered Northway off the job on August 8, 1972 and brought in Brett Rein-

forcing Steel Erectors (hereinafter "Brett") to complete the erection. Brett is a subsidiary of Dimeo, for all intents and purposes.

Against this background the Court makes the following additional findings of fact and conclusions of law.

In its written subcontract with Dimeo, Inland agreed to assume toward Dimeo all the obligations pertaining to its designated work that Dimeo had assumed toward the Providence Civic Center Authority. Inland further agreed that any changes in the planned work made by it without written authorization were done "at its own risk". Inland was to receive, as compensation for authorized and properly documented extra work, the cost thereof plus 15% for overhead expenses and profits. While said subcontract incorporated the September 25, 1972 completion date for the entire project which was established by the Dimeo–Providence Civic Center Authority contract, it set out no specific schedule for erection of the roof deck and siding.

Dimeo's original construction schedule for the entire project indicated that the erection of roof deck was to begin September 1, 1971 and to conclude December 1, 1971, and the erection of siding would begin October 15, 1971 and conclude January 1, 1972. Northway was not informed of the existence of this schedule before or during its performance of its subcontract with Inland.

On April 2, 1971, Dimeo advised Inland that the roof deck should be erected in four phases: the first commencing September 10, 1971 and the last commencing January 5, 1972. On August 24, 1971, Dimeo informed Inland by letter that the erection of siding was scheduled to begin October 15, 1971. In this letter Dimeo asked Inland how long it would take to erect the siding, thereby indicating that Dimeo had not at that time fixed a definite period of time within which the siding was to be completed. There was no evidence that Inland and Dimeo followed through on this matter to arrive at a schedule based on Inland's projected time requirements, prior to January, 1972.

Inland invited Phelps to bid on the subcontract for the labor involved in the erection of the roof deck and siding. Phelps, in turn, subcontracted the erection to Northway. When Inland extended the invitation to bid, it also forwarded to Phelps a set of shop drawings depicting the Civic Center structure, the roof deck and siding materials and the design for erection.

In the course of preparing the Phelps and Northway bids, Gregory Beeche, then of Phelps, and Henry Johnston of Northway analyzed the shop drawings and visited the construction site. They observed that Aborn Street appeared available for storing materials and that the siding was to be applied on walls which were cantilevered. They then conceived the idea of using hanging scaffolding which would fit the unusual contour of the building. According to rough sketches which were prepared, said scaffolding would be suspended from the roof where it could be placed on a track to facilitate its movement around the structure. Beeche and Johnston were of the opinion that the erection of siding from hanging scaffolding would be fifty per cent more efficient than the erection of siding from the more traditional standing scaffolding. This was a factor in the preparation of Northway's bid to Phelps and Phelps' bid to Inland.

Northway submitted its bid of $120,500 to Phelps on September 4 or September 5, 1971. Its profit margin was between $18,000 and $20,000. When it submitted its bid, Northway planned to employ hanging scaffolding to the exclusion of standing scaffolding and to assign two crews to the erection of siding. Northway then anticipated that it would require twenty weeks to erect the roof deck and twenty weeks to erect the siding, and that, assuming all the material was available at proper times, the two projects could be performed simultaneously. When Inland accepted Phelps' subcontract bid of $132,400, on or about September 7, 1971, it was aware of Northway's projected schedule and of Northway's plan to use hanging scaffolding. Johnston

and Beeche visited the construction site on September 8, 1971, having been told by Inland that erection would begin on that date. Once there, they were informed by Dimeo that erection could not begin until October 15, 1971 or November 1, 1971.

On or about September 15, 1971, Northway formally retained the services of James Cullinan, an engineer, to refine the design and complete the fabrication of the hanging scaffolding. Two sets of hanging scaffolding were fabricated at a total cost of $5,800 and were ready for use October 15, 1971.

Dimeo advised Inland on September 16, 1971 that roof deck would not be needed until late in February, 1972. Inland had already begun shipment of roof deck to Calore Freightways storage yards pursuant to earlier instructions of Dimeo given in anticipation of a September, 1971 starting date. Due to the projected delays in the starting date, it was necessary in order to protect the roof during storage to insert wooden slats between decks to promote the drainage of water and retard rusting. In the course of performing this work, Dimeo personnel altered the sequence of roof deck packaging and the positioning of the individual sheets of roof deck.

Phelps and Northway formalized their said subcontract for erection on October 13, 1971. No performance schedule was specified in the written subcontract. Two days later Beeche, not having been informed that the commencement of erection had been delayed, again visited the construction site to determine if erection could begin. Dimeo personnel informed Beeche that he would have to wait because Dimeo desired to keep the roof deck off so that concrete could be lowered by crane through the opening for the pouring of the concrete arena seats. At this time Dimeo had not yet formally updated its said original construction schedule despite substantial projected deviations therefrom.

In late October or early November, 1971, Beeche informed Phelps that he would be leaving its employ in February, 1972. Consequently, Phelps requested permission to terminate its erection subcontract with Inland. Later Beeche did, in fact, leave Phelps and join Northway, and Phelps terminated its subcontract with Inland when Northway subcontracted directly with Inland to undertake the erection.

On January 7, 1972, Dimeo directed Inland to commence the erection of roof deck in the beginning of February, 1972 and the erection of siding on March 1, 1972. In January, Johnston of Northway visited the Calore Freightways yard and discovered that the roof deck stored there did not conform to the shop drawings sent by Inland to Phelps in the previous summer. The roof deck lacked access holes required for the welding of the deck to the supporting structural steel. Subsequently to March 20, 1972, Inland and Northway agreed, without using a written Change Order, that Northway would drill 4,500 access holes as an extra, i. e., work in addition to that contemplated by the existing subcontracts, for the consideration of $1.00 per hole. Northway fully completed this work before being terminated from the job.

In January, 1972, John Cashman assumed the position of construction manager for Dimeo on the Civic Center project. In the course of formulating a new construction schedule for the entire project, he inquired of Inland how much time was required for the erection of roof deck and siding. Having first projected that each phase would take approximately six weeks to complete, Inland later informed Cashman that each phase would consume between twelve and fourteen weeks. Inland did not then relate to Dimeo that Northway itself had predicted it would require twenty weeks to complete each job. On February 16, 1972, Cashman drafted a new job progress schedule pursuant to which roof deck was to be erected between February 21 and June 15, 1972, and siding would be erected between April 1 and August 1, 1972. In preparing this schedule, Cashman determined that the allotted time of sixteen and one-half weeks for the erection of roof deck and seventeen weeks for the erection of siding was reasonable and realistic. Nevertheless, Dimeo desired that Inland complete erection as

promised within its twelve to fourteen week projections. Dimeo showed this schedule to the Civic Center Authority, but not to Inland or Northway.

On March 20, 1972, Inland granted the request of Phelps to terminate its said erection subcontract and entered into a new erection subcontract directly with Northway. This subcontract contained no specific erection schedule, but did include an agreement that time was of the essence and that Northway would commence work immediately upon notice from Inland and proceed promptly to complete the work in compliance with Dimeo's job progress schedule. At the time of entering this subcontract Northway again informed Inland that it would require twenty weeks to complete the roof deck and siding. Inland did not protest this schedule. No particular number of laborers, kind or number of scaffolds or sequence of erection were specified in the subcontract. Northway anticipated a profit of $30,000 from the subcontract price of $132,400.[1] Inland reserved the privilege of terminating Northway's right to proceed with the work in the event Northway persistently or repeatedly failed or refused to supply enough properly skilled workmen or proper materials or persistently disregarded Inland's or Dimeo's instructions. At the time of this subcontracting, Inland was aware of the identity of Northway's supervisory personnel and of Northway's intention to use hanging scaffolding rather than standing scaffolding.

In compliance with the directions given Johnston by Render of Inland, Northway manned the job on March 20, 1972. Inland had failed to notify Northway that in fact Dimeo had requested Inland to commence erection at the beginning of March. When Northway arrived at the site, however, the structural steel was not properly prepared to receive the roof deck. A different subcontractor of Dimeo was responsible for this fabrication error. Dimeo was obligated to make the corrections. The following day, Inland directed Northway to leave the site. Northway incurred crane rental fees and expenses for personnel working with the crane for one and one-half unproductive days. The fair value of one crane day, which includes crane rental and work crew costs, is $1,096.00. The fair value of one and one-half crane days is, therefore, $1,644.00.[2]

Beginning in late March, 1972, there was a labor strike at Inland's manufacturing plant which lasted four weeks and prevented Inland from satisfying schedules for on site delivery of wall panel and liner and acoustical deck. Northway returned to the job site, as directed by Inland, on April 5, 1972. Neither Inland nor Dimeo had ordered Northway to recommence work prior to April 5, 1972.

After Northway resumed work on the roof, Calore Freightways delivered roof deck to the site out of sequence and improperly packed. This arose from Dimeo's improper rebundling of the materials at the

---

1. Other pertinent provisions of the Inland-Northway subcontract include:

   "Subcontractor shall provide all labor, materials, equipment, etc., necessary to: unload, hoist and install all materials furnished by Inryco [Inland] per plans and specifications in our [Inland's] contract with Dimeo Construction Co. All to be in accordance with the Contract drawings and specifications, the appropriate Inryco drawings, and as required by Inryco under the contract."

   "The subcontractor shall fully inform himself as to the existing conditions and limitations at the jobsite and the burden of this knowledge shall be on the subcontractor."

   "No alterations, additions or deletions shall be made in the work or materials shown or described by the drawings and specifications

   or other provisions in the contract documents except on a written Change Order between Inryco and the Subcontractors and when so made, the value of the work and materials so altered, added or deleted, shall be computed and determined by Inryco and the subcontractor and the amount so determined shall be added to or deducted from the contract price. No verbal order, objection, claim or notice by either party to the other, either before or after the execution of this Agreement shall be of effect or binding against each other."

2. Inland initially pursued this expense as an extra against Dimeo, according to Hillers of Inland, which evidences Inland's belief at the time that this was a legitimate extra.

Calore Freightways storage yard. The failure to ship the materials properly gave rise to twelve man days of extra work. At the customary and fair value of $18.00 per man hour, this work had a value of $1,728.00.

Between April 5 and May 18, 1972, Northway stored a large quantity of siding material on Aborn Street, which bordered the job site. This practice was consistent with the custom and practice of the trade of siting materials, whenever possible, next to the area where the materials are to be erected. Northway personnel who had visited the job site prior to bidding had anticipated that materials could be stored on Aborn Street when preparing their bid. Northway did not, however, get specific authorization to use Aborn Street from Dimeo, Inland or the Civic Center Authority.

Earlier, on March 7, 1972, the Civic Center Authority had notified Dimeo that it would have to vacate Aborn Street by March 13, 1972. Dimeo sent a letter, dated March 28, 1972, to the Civic Center Authority purporting to confirm an agreement that permitted Dimeo and its subcontractors to remain on Aborn Street an additional eight to ten weeks. The letter implied that construction would have been delayed if the extension had not been granted. The Civic Center Authority responded on April 5, 1972, that Dimeo could have the use of Aborn Street until May 12, 1972. By letter dated April 14, 1972, Dimeo informed Inland of the May 12th deadline for removing materials from Aborn Street. Not until May 18, 1972, however, did Northway receive notification from Inland that it would have to remove its materials from Aborn Street forthwith.

Had the appropriate siding materials been delivered as planned beginning in late March and early April, 1972, Northway would have completed the work which was facilitated by the storage of materials on Aborn Street before May 18, 1972. Instead, Northway spent three and one-half crane days moving said materials from Aborn Street to the rear of the structure being built. At a fair value of $1,096.00 per crane day, the value of this work was $3,836.00.

Hillers and Render of Inland agreed orally that Northway should and would be compensated for the work, but did not agree to any specific price. The materials were relocated some three hundred to four hundred feet from the point on the building to which they were eventually applied. This meant that individual units had to be hand carried as needed to the point of erection. The thirty man days devoted to carrying this material would not have been spent had Northway continued to use Aborn Street for storage. At a fair value of $18.00 per man hour, this work had a value of $4,320.00. Both Render and Elliott of Inland conceded directly or indirectly that Inland should compensate Northway for this labor and Render informed Northway, without agreeing to a specific price, that Inland would absorb the expenses.

In late May or early June, Inland advised Northway that the sequence for erection of the louver and siding panels would be altered from that specified by the architect. Inland failed to deliver the louvers as planned. Inland also did not deliver structural girts, which were necessary for the commencement of the erection of siding, until May 18, 1972. Those structural girts which arrived on that date were bent in shipment and had to be returned. New structural girts arrived at the job site June 6, 1972, along with the first shipment of screws and subgirts. These new structural girts required field modification, which Inland, on June 13, 1972, authorized Northway to perform. Said modification involved the enlargement of holes in the structural girts, accomplished at an agreed fair cost of $1,320.00, and the slotting of holes, substantially completed at an agreed cost of $5,519.50. Inland actually expected Northway to proceed with this work, without written authorization, pursuant to an oral arrangement reached June 6, 1972. As noted above, however, Inland sent Northway a written authorization on June 13, 1972. Subsequently, Inland issued a formal written Change Order for the enlarging of the holes but not for the said slotting work. Northway also discovered that Inland failed to include in its shop drawings a sufficient

number of structural girts to secure the siding to the building's frame. Inland authorized Northway, without using a written Change Order, to install the extra line of girts at the agreed price of $5,312.50, which work was done after June 13, 1972.

Northway also experienced problems with Inland's delivery of materials for the roof job. As part of its subcontract Northway was obligated to install ridge and valley plates on the roof of the Civic Center. Inland supplied plates of the wrong dimension and improper shape. At Inland's direction, subsequently ratified by a written Change Order, Northway modified said plates at an agreed fair price of $1,150.00. Northway was also responsible for installing perimeter roof deck. Inland supplied approximately seven hundred sheets of such deck of the wrong dimensions. Northway completed modification of five hundred sixty sheets prior to its termination, without a written Change Order, at an agreed fair cost of $5,600.00.

Throughout the course of the erection of siding, Inland delivered siding outer panels which were marred by scratches, caulking and dents. To determine the condition of said sheets, Northway had to hand sort each sheet. It then had to field clean and otherwise repair many of the sheets at the job site. Northway sorted and stacked approximately seventy-five thousand square feet of defective sheets for return shipment. One thousand four hundred forty man hours were devoted to this work, the fair value of which was $25,920.00.

It was Inland's responsibility to have erection materials delivered as needed to the site by Calore Freightways. During the course of the erection project, Calore Freightways consistently failed, through no fault of Northway's, to deliver roof materials as needed and as instructed. Late deliveries continued even after repeated complaints from Northway. Northway contends that these repeated late deliveries by Calore Freightways caused delays which resulted in Northway's incurring expenses for between sixteen and twenty-one additional crane days. Northway did not, however,

establish this by a preponderance of the evidence. Thirty-four crane days were expended on the erection project, of which some nineteen days were required to perform the work called for in the subcontract itself. One and one-half "extra" crane days were consumed by the said delay of March 20, 1972, and three and one-half "extra" crane days were devoted to moving materials from Aborn Street, as noted previously. Therefore, only ten "extra" crane days resulted from the late deliveries. At the fair value of $1,096.00 per crane day, the cost of ten crane days was $10,960.00.

Inland was obligated to supply Northway with screws for the installation of siding material. In the middle of June, 1972, having failed to supply the screws, Inland orally authorized Northway to purchase screws on its own to expedite erection. It did not then authorize payment to Northway of a commission or percentage in addition to the cost of the screws. Well after procurement of the screws, Inland issued a written Change Order authorizing payment of $420.00 for the said screws. On July 28, 1972, Northway agreed to the $420.00 figure. At trial Northway claimed that it was entitled to reimbursement of $523.76 for this item. Northway left the originally ordered screws which eventually arrived from Inland at the job site as directed by Inland.

In light of the late start and the delays caused by the late delivery of materials and the delivery of defective materials, Dimeo urged Inland to accelerate erection throughout May, June and July, 1972. On June 13, 1972, the very day on which Northway finally possessed materials sufficient to commence the siding erection, Inland informed Northway that Cashman of Dimeo was already complaining of Northway's lack of progress. A meeting was held at the job site on the following day at which Cashman reiterated to Hillers of Inland his dissatisfaction with Northway's efforts. Cashman was then informed of Northway's projected twenty weeks erection schedules for the roof deck and siding. This was the first time anyone had informed someone from Dimeo of these schedules. Dimeo,

noting that twenty weeks from that date extended past the completion date set in the general contract, urged Inland and Northway to complete erection instead within eight weeks. Hillers of Inland suggested at this June 14 meeting that erection could be completed in twelve weeks and Cashman reluctantly accepted this projection. Northway never agreed with this twelve weeks projection.

Cashman was aware that Northway had planned to erect the siding from hanging scaffolding, but directed Inland to have Northway accelerate erection by also employing standing scaffolding. Inland and Dimeo agreed that Northway should not have to pay the cost of assembling and dismantling the standing scaffolding since its use was not contemplated by Northway either when it bid the job or thereafter. Northway protested the order from Inland that it use standing scaffolding, contending that it was less efficient than the hanging scaffolding, thus more expensive to man.

On June 18, 1972, Inland threatened Northway with removal from the job if it did not comply with Dimeo's wishes. Northway was unhappy with Dimeo's pressure and with Inland's lack of concern for unresolved matters related to Northway's claims for extras. Inland promised to work out these claims and Elliott of Inland invited Beeche of Northway to send a letter to Inland explaining them. Beeche sent such a letter on June 21, 1972, which letter includes Beeche's comment that Burach of Inland had told him that Inland was already in the process of getting prices from other erectors to complete the job in Northway's place.

Another meeting was called at the job site on or about June 26, 1972. At this meeting Cashman of Dimeo again complained of the lack of progress on the erection and requested that standing scaffolding be manned. When Northway reiterated

its schedule to complete work eighteen to twenty weeks from the date of commencement, Cashman stated to Render of Inland:

". . . something has got to be done about this because otherwise we are not going to be doing business with Inland-Ryerson."

Dimeo was then an established account and valued customer of Inland's. Northway agreed to man the standing scaffolding for the time being, but reinformed Cashman that extra expenses would thereby be incurred. Render of Inland promised to settle Northway's claims for extras by July 5, 1972.

On or about July 7, 1972, the vice-president of the building panel division of Inland telephoned Findlay of Inland concerning a complaint he had received from Cashman of Dimeo about erection progress. As a result of that call, Findlay scheduled a meeting with Northway at the job site for July 11 or 12, 1972. At this meeting Inland informed Northway that it required additional substantiation for the claimed extras and that Inland would pay all substantiated claims. Following their meeting, Inland and Northway representatives met with Cashman of Dimeo who was still unsatisfied with erection progress. Northway reaffirmed its promise to man temporarily the standing scaffolding.

On July 12, 1972, Beeche telephoned Inland to express his concern with, among other things, the lack of progress in settling the extras. In response to this call, Inland sent Elliott to the job site to review matters. Elliott met with Beeche and Johnston of Northway and Cashman of Dimeo on July 17, 1972 in order to review the aforementioned problems. Elliott filed an interoffice report with Inland two days later.[3] In it he commented that, provided the two hanging and one standing scaffolds then being manned continued to be manned, the

---

3. The following paragraph from page 3 reflects the tone of the report:
   "I would like to point out in my observation and conversations with people at the job site, including Cashman, that our allegations of poor management on Northway's part is [sic] greatly exaggerated. Although I do not feel they have been the greatest of managers, I don't see how they could have done a hell of a lot better due to the beautiful way we got materials to them."

project would continue to proceed as efficiently as possible. He concurred with Northway's prediction that the job could be completed in eight weeks, but it is not clear whether his concurrence with Northway's prediction was made contingent upon the full time manning of the standing scaffold.

On July 21, 1972, Inland directed Northway, in writing, to utilize standing scaffolding on the west wall of the Civic Center and promised to pay part of the expense of assembling the scaffold. In a letter dated July 24, 1972, Burack of Inland discussed the matter of extras, ignoring some of Elliott's said findings and rejecting certain of Northway's other claims, e. g., that for the said drilling of access holes and that for the said installing of the extra line of structural girts.

During the erection of siding Beeche of Northway was at the job site approximately 30% of the time and Johnston of Northway was there about 70% of the time. Inland had reservations concerning the competence of Northway's supervisor, Dobroski. By having either Beeche or Johnston at the site, Northway satisfied those of Inland's complaints about the skill of Northway's workmen which focused on Dobroski.

During the latter part of July, Dimeo's pressure on Inland to have Northway accelerate erection increased. Dimeo had promised the Civic Center Authority that it would have the structure sufficiently completed to permit the playing of a hockey game there in the first week of November, 1972. Throughout this time the media drew the public's attention to the possibility of a late completion, which increased the pressure on Dimeo. It was reasonable in this instance, as well as consistent with the custom of the construction business, for Dimeo, as the general contractor and coordinator of the job, to convene job meetings and there to urge subcontractors to expedite work or work in a particular area. Dimeo went beyond what was customary in the trade when it gave specific instructions to Northway workers on how to actually perform certain erection tasks. For the most part Northway disregarded these instructions, except for those concerning the employment of standing scaffolding.

Neither Inland nor Dimeo made a specific offer to Northway of compensation for the expenses Northway incurred in manning standing scaffolding. Yet the erection of siding from the standing scaffolding was 50% less efficient than erection from the hanging scaffolds. The hanging scaffolds did not have cross members or struts separating the men from the wall on which they were working, as do standing scaffolds. The three levels of the scaffolding were designed so that men working on the scaffolds could perform their tasks at the most efficient level and sequence. Unlike standing scaffolding, the hanging scaffolds had no supports affixed to the ground. Consequently, it was considerably easier for laborers on the ground to hand up materials to workers on the scaffolds. It was also far easier to move the hanging scaffolds around the building since they were anchored to a track on the roof of the Civic Center. Unlike standing scaffolds which had to be dismantled and reassembled as new areas of siding were erected, the hanging scaffolding could be moved along the track fully assembled. Northway manned the standing scaffolding for one thousand one hundred fifty hours. Northway contends that 50% of the expense for this work constitutes extras, which, at a fair value of $18 per hour would amount to $10,350.00.

On August 7, 1972, Cashman of Dimeo agreed to supply two ironworkers to work for Northway on the remaining subgirts in return for Inland's relinquishment of its claims against Dimeo for backcharges arising from Northway's work.

In the morning of August 8, 1972, there was a meeting at the job site attended by Hacket, Render, Burack, Elliott and Findlay of Inland, Cashman and Thomas Dimeo of Dimeo, and Beeche and Dobroski of Northway. Johnston, the president of Northway, planned to attend but his health did not permit it. Inland and Dimeo rejected Beeche's request that the meeting be postponed because of Johnston's absence. Those at the meeting attempted to formu-

late ways to promote erection progress, but no specific agreements were reached. Thomas Dimeo scheduled a meeting for later that day with a union business agent to urge the union to supply Northway with a better caliber of manpower.

At approximately noon, a second meeting was held at the Holiday Inn adjacent to the job site. Findlay and Elliott of Inland, Beeche and Dobroski of Northway and a representative of Calore Freightways attended this meeting, convened to discuss the aforementioned complaint concerning late deliveries. At the close of the meeting, Findlay offered to pay Northway ten percent of its claims for extras, which offer Northway rejected. Subsequently, Findlay told Northway to permanently man the standing scaffolding and dispatched Hacket to survey the project and estimate a completion date. Inland had been under the impression it would take eleven weeks to complete the siding, while Northway predicted that it could finish the work in four to six weeks. Hacket returned and reported that erection could be completed in five weeks.

A third meeting was held late in the afternoon of August 8, 1972, at Dimeo's field office. Dobroski and Beeche, Elliott, Burack, Findlay, Cashman, Thomas Dimeo and Magner, a Dimeo employee, and a union business agent attended. Beeche was late for the meeting because he was with an injured employee and investigating problems created by large open excavation trenches bounding the perimeter of the building. These trenches hindered the ability of Northway personnel to carry siding material to the point of erection. When Beeche arrived at the meeting, Cashman of Dimeo asked him what Northway would do to accelerate the job. Beeche suggested they inspect the job site to review working conditions, whereupon Findlay and Burack of Inland left the room. Shortly thereafter, Findlay invited Cashman and Thomas Dimeo to join them. Findlay informed Thomas Dimeo that Inland had decided to remove Northway from the job. Inland did not then have arrangements with anyone to pursue the project in Northway's place, so Findlay asked Thomas Dimeo if he would be willing to complete the project. He replied that his company would be willing to take the job on a time and material basis. There was no evidence that Dimeo personnel requested or urged Inland to remove Northway from the job.

Eventually Elliott of Inland joined those who had left the meeting. Shortly thereafter, he returned to the meeting room and informed Beeche that Inland was terminating Northway's right to proceed with the project. The primary reason for this decision was that Findlay and Burack of Inland did not believe that Northway could finish the job expeditiously enough to suit its customer, Dimeo.

In its formal termination notice to Northway Inland stated that it was removing Northway because of its failure to supply sufficient workmen, to pursue the work diligently and to follow the instructions of Inland and Dimeo personnel. As of August 8, 1972, Northway had been manning both standing and hanging scaffolds. Dimeo and Inland had requested Northway to commit additional men to manning the standing scaffolding until erection was completed. At that point Northway had no guarantee that it would be compensated for the alleged extra work involved in manning the scaffolding or for many of its other claims for extras. Consequently, Northway refused to make the commitment of additional men as requested by Dimeo and Inland. At no time did Northway refuse to proceed with erection or threaten to halt erection pending resolution of its claims for extras.

Between June 13, 1972, when Northway was first able to initiate erection of siding, and August 8, 1972, Northway completed fifty-five percent of the siding. As of August 8, 1972, Northway had completed ninety-five percent of the roof deck and seventy-five percent of its entire erection subcontract. Inland paid Northway $71,496.00 on July 31, 1972 for work performed through July 8, 1972. This sum represented compensation for completion of sixty percent of

the entire erection project, less a ten percent retainer. The quality of Northway's .work was satisfactory.

Inland entered into a subcontract for erection services with Brett on .August 9, 1972, on a cost plus ten percent basis. In negotiating said subcontract, Inland never asked Brett for a cost estimate or a timetable for erection. Northway could have completed erection within six weeks of August 8, 1972, at a fair cost under its subcontract of $25,000.00, exclusive of extras. Brett did not substantially complete the project until at least eight and one-half weeks later. Inland paid Brett $104,430.51 for its services and credited Dimeo's account with additional sums for services Inland alleges were furnished Brett by Dimeo as part of the erection project. Prior to its working on the Civic Center project, Brett had never erected siding, its specialty being in the entirely different field of reinforcing steel erection. Brett briefly retained Dobroski, the Northway foreman upon whom Inland and Dimeo complaints focused, after Northway was terminated from the job.

Though it was still finishing construction in January, 1973, Dimeo did not incur the penalty for late completion which was set in the general contract.

In the course of performing work on the Civic Center, Northway sustained expenses of $134,545.74, not including $28,794.08 in withholding taxes which it had not paid over to the Government at the time of trial.

In support of its claim against Dimeo, Northway established that its gross sales in 1972 were in excess of $200,000.00 more than in 1973.[4] From the date of termination to that of trial, several contractors with which Northway formerly did business, did not invite Northway to bid on projects. No testimony was elicited from personnel representing these contractors as to the reason therefor or as to the amount of sales to them Northway could have anticipated. As a general matter, however, termination damages a business's reputation. Once terminated from an erection job the size of the Civic Center project, it requires four or five years to recover the kind of reputation necessary to attract invitations to bid on jobs of similar magnitude. No evidence was introduced by which this Court could determine the percentage of Northway's gross sales in 1971 and 1972 attributable to jobs of the magnitude of the Civic Center project.

Finally, Northway established that it incurred reasonable attorney's fees of $25,-250.00 during the course of the instant litigation.

## I.

### a.

■ The initial question with regard to the claims of Northway and Inland against each other is whether Inland's termination of its erection subcontract with Northway was justified. Inland attempts to justify its action on the following grounds: that in demanding resolution of its claims for extras Northway imposed an unwarranted condition precedent to its committing additional men to work for the duration of the project on the standing scaffolding, thereby satisfying the contractual prerequisite for termination[5] and that Northway's actions manifested doubt as to its willingness or ability to perform its obligations substantially in accordance with the terms of the contract. In support of its position, Inland endeavored to establish at trial that Northway had not diligently pursued the erection of siding and had rejected the instructions of Inland and Dimeo personnel to take certain steps essential to a timely completion of the project.

---

4. The Court notes that there is an unexplained difference in the statements of retained earnings and income for 1972 offered in evidence by Northway, plaintiff's exhibits 42 and 43. According to the statement dated August 8, 1973, gross sales were $437,712.29 and the gross profit was $39,646.97, while the statement prepared April 19, 1974 lists gross sales as $427,-712.29 and the gross profit as $29,646.97. The gross sales in 1973 were $204,394.12 and the gross profit was $29,347.51.

5. *Infra* at 423.

While the Inland-Northway subcontract contained no specific schedule, Inland was aware of and implicitly approved at the time of contracting Northway's plan to devote twenty weeks to the erection of siding. This was the basis of the bid underlying the subcontract and the reason Northway had only two sets of hanging scaffolding fabricated for the job. Once it was permitted to commence erection, Northway never fell behind its own erection schedule. In its job progress schedule of February 16, 1972, Dimeo allotted approximately seventeen weeks for the erection of siding. Northway completed fifty-five percent of the siding, plus work not contemplated by its subcontract, in the eight weeks it was able to work thereon, and could have finished erection within Dimeo's allotment of seventeen weeks.

The basic problem was not that Northway proceeded more slowly than the parties originally anticipated, but that it was not permitted to commence siding erection as early as the parties had expected, that it was under pressure to satisfy Inland's unreasonable commitment to Dimeo to erect siding in approximately twelve weeks, and that it encountered delays for which it was not responsible once it commenced erection. As the deadline for completion of the entire Civic Center project approached, Dimeo and Inland were under increasing pressure to satisfy their own contractual obligations. Since Northway's work was incorporated into their obligations, Dimeo and Inland were naturally anxious for Northway to accelerate erection. The fact remains that this need for acceleration was generated in large part by Inland's failure to supply Northway with various siding materials of usable quality in a timely fashion. Not only was Northway delayed by late deliveries of materials, but it devoted a substantial number of additional unanticipated man hours to modifying defective materials and installing girts not shown on the original shop drawings. Inland's position that Northway was obliged to comply with the

directions of Dimeo and Inland to accelerate erection however much they lessened Northway's time for erection, however expensive the consequences and however blameless Northway was for generating the need for acceleration, is unreasonable. Inland, in effect, attempted to shift the burdens it created to Northway as it insisted Northway perform in a time period and at an expense not reasonably required by the said subcontract. *Cf. J. K. Welding Co. v. W. J. Halloran Steel Erection Co.*, 178 F.Supp. 584 (D.R.I.1959).

The Court concludes that Inland had no right under the subcontract to demand that Northway accelerate erection at its own expense in order to satisfy the completion date in Dimeo's said job progress schedule of February 16, 1972 or Dimeo's urgings thereafter. Given the facts in this action, Inland was unjustified in terminating its erection subcontract with Northway and is, therefore, liable for damages for the breach of that subcontract.[6]

Northway is entitled to recover an amount that will put it in as favorable a position as it would have been had it been permitted to complete its work. 5 Corbin § 1094 (1964); *George v. George F. Berkander, Inc.*, 92 R.I. 426, 169 A.2d 370 (1961). The Court will award Northway the full contract price, $132,400.00, less the reasonable cost for completion of the project, $25,000.00, and less the amount Inland has already paid Northway, $71,496.00. *See* 11 Williston § 1363 at 342 (3d ed. 1968). The amount of Northway's recovery on this claim is, therefore, $35,904.00. It follows from this conclusion that the Court also will enter judgment for Northway on Inland's counterclaim.

*b.*

Northway claims that it is entitled to additional compensation from Inland for certain extra work. Among these alleged extras are the following items for which Inland admits liability:

---

**6.** The Court also rejects as contrary to the facts any suggestion that termination might be justified by Northway's failure to provide enough properly skilled workmen.

| | |
|---|---|
| 1. drilling 4,500 access holes at $1.00 per hole | $4,500.00 |
| 2. modifying ridge and valley plates (roof deck) | $1,150.00 |
| 3. cutting 560 sheets of perimeter roof deck at $10.00 a sheet | $5,600.00 |
| 4. enlarging holes in structural girts | $1,320.00 |
| 5. slotting holes in structural girts | $5,519.50 |
| 6. installing extra line of structural girts | $5,312.50 |
| Total | $ 23,402.00 |

#### c.

In addition to the aforementioned claimed extras about which there is no dispute, Northway seeks reimbursement for certain other expenses it incurred which allegedly were not contemplated by the said written subcontract. Inland denies being liable for any such expenses contending that it did not authorize them in accordance with the said subcontract and specifically contends that each claimed item was either not substantiated or was not in fact an extra or both.

■ As previously noted, *infra* at 423, the Inland-Northway subcontract stated that no alterations, additions or deviations in the work described therein or in drawings and specifications would be made except upon a written Change Order between Inland and Northway. Throughout the course of the project, however, Inland issued only three written Change Orders: one covering a $420.00 expenditure for screws, another covering the modification of ridge and valley plates for $1,150.00 and a third pertaining to the enlarging of holes in structural girts for $1,320.00. As previously noted, Inland concedes it is liable for the last two items. The four additional items for which Inland concedes it is liable represent alterations and additions for which it issued no written Change Orders. Moreover, in the three instances Inland utilized a written Change Order it did so well after the work they purportedly authorized

was completed.[7] In light of these facts and the fact that Inland accepted without protest and in most cases actually ordered the alterations, additions and deviations encompassed by Northway's work, this Court concludes that Inland waived any right it had to demand that Northway produce written Change Orders before being compensated for extra work. *See Ostroff v. Stephen Girard, Inc.*, 79 R.I. 158, 85 A.2d 174, 175–176 (1951); *Fanning & Doorley Construction Co. v. Geigy Chemical Corp.*, 305 F.Supp. 650, 670–671 (D.R.I.1969); *Charles Burton Builders, Inc. v. L & S Construction Co., Inc.*, 260 Md. 66, 271 A.2d 534, 545 (1970).

■ Northway, therefore, is entitled to recover the amount agreed upon by the parties or, in the absence of an agreement, the fair value attributable to tasks it performed which were not specified within said subcontract. The first such item for which Northway seeks compensation is the procurement of screws, *infra* at 17, at an alleged value of $523.76. The parties, however, had actually agreed prior to termination that Inland would pay $420.00 to Northway for this extra. Additionally, this Court finds this $420.00 sum upon which negotiations focused during the project's life, a more accurate reflection of the value of this extra than the $523.76 sum claimed at trial.

■ The second item for which Northway claims a right to compensation is its handling, cleaning and repairing of defective siding panels, *infra* at 425. This work, for which Inland was responsible was done with the knowledge and approval and for the benefit of Inland. Northway established that its efforts had a fair value of $25,920.00 and, accordingly, it is entitled to that sum.

7. Inland's written directions to Northway to undertake certain work and its written offers to settle certain claims do not constitute written Change Orders in satisfaction of the terms of the contract. The distinction is well illustrated by a comparison of exhibit 7, in which Inland by letter approved the enlarging of holes in structural girts, and exhibit 29, which is a written Change Order for that work. The Court further notes that on occasion Inland expected Northway to proceed with work which it conceded was extra without written authorization of any kind.

■ The third item in dispute is the expense to Northway which arose from the repeated failure of Calore Freightways to deliver materials as needed and as instructed, *infra* at 425. As a natural consequence of these delays Northway incurred compensable additional expenses of $10,-960.00, for which Inland is responsible. *See Johnson v. Fenestra, Inc., (Erection Div.), 305 F.2d 179, 181–182 (3d Cir. 1962).*

■ The fourth of the alleged extras involves Northway's claim for compensation for the value of one and one-half crane days wasted when it first appeared on the job site March 20, 1972. Northway was ordered off the job the following day to allow Dimeo to correct a fabrication error for which Northway was not responsible, *infra* at 423. Inland contends, citing certain language in the subcontract, that Northway, prior to manning the job, should have visited and inspected the site and ascertained for itself that it could not commence erection. The general clause in the Inland-Northway subcontract that the "subcontractor shall fully inform himself as to the existing conditions and limitations at the job site" does not, however, relieve Inland of liability for the expenses of this false start. Northway manned the job at Inland's direction, in compliance with a more specific and herein controlling provision of the said subcontract which required Northway to commence work immediately upon notice from Inland. *See generally Fanning & Doorley Construction Co. v. Geigy Chemical Corp., supra* at 672. Northway is entitled to recover $1,644.00 for this item.

■ As its fifth and sixth items for extra compensation, Northway cites the expenses it incurred in using a crane to move its materials stored on Aborn Street and in carrying by hand this same material from the point it was relocated back to the appropriate area for erection, *infra* at 424.

Prior to actually commencing work at the job site, Northway had correctly ascertained that it could use the Aborn Street area to store materials. Dimeo sanctioned this use by its efforts to retain the availability of the area for storage. In April, 1972, when it learned that use of the area would have to be terminated, Dimeo encouraged Inland to expedite any erection which would be facilitated by the availability of Aborn Street. Had the structure been ready for erection and appropriate materials been delivered, as planned, beginning in late March and early April, 1972, erection in the area could have been completed before May 18, 1972. Erection, however, was delayed and the instant problem arose. The Inland-Northway subcontract made time of the essence and the work involved in moving by crane and hand the materials initially stored on Aborn Street was a natural consequence of Inland's delays. *See Johnson v. Fenestra, Inc., (Erection Div.), supra.*

In addition, a representative of Inland, when told by Northway that it would not move said materials unless compensated therefor as an extra, agreed orally that Inland would pay Northway the fair value of this expense.

For either of the above reasons, Northway is entitled to recover on this claim. It devoted three and one-half crane days to the work, the fair value of which is $3,836.00. Guided by the testimony of Johnston of Northway and the estimate of Elliott of Inland,[8] the Court finds that Northway spent thirty man days hand carrying these materials, at a fair value of $4,320.00.

■ The seventh item for which Northway claims a right to compensation is that portion of the expense of manning standing scaffolding which it would not have incurred had it been allowed to proceed with the erection in the manner it had conceived, *infra* at 427. Inland ordered Northway to accelerate erection largely to compensate for earlier delays Inland had itself occasioned. Specifically, Inland directed Northway to depart from its plans and man standing scaffolding. Northway established at trial that compliance with Inland's orders caused it to incur unanticipated ex-

**8.** *See* exhibit 34.

penses since the utilization of standing scaffolding was only one-half as efficient as the employment of hanging scaffolding. Under the circumstances, one-half of the time devoted to manning the standing scaffold represents extra work for which Northway is entitled to $10,350.00 in compensation.

Finally, Northway contends that it should be compensated for the fair value of its work arising from the failure of Inland to deliver certain shipments of roof deck in sequence as instructed, *infra* at 423–424. It is true that when the Northway-Inland subcontract was entered the said roof deck was already being stored at the Calore Freightways yard out of sequence. At this point, however, the condition of the materials was not Northway's concern. The important matter was the delivery of the materials. The Inland-Northway subcontract obligated Inland to supply materials in a manner consistent with the undertaking of the parties as to the prompt completion of the erection. In this instance Inland simply ignored the problem created by the way in which the materials were stored, delivering the problem along with the materials to Northway. Northway is entitled to be compensated for this unanticipated work in the amount of $1,728.00.

The total fair value of the disputed items of Northway's extra work is: $59,178.00. The total fair value of the aforementioned undisputed extra work is: $23,402.00. The Court awards Northway the sum of these two figures plus the $35,904.00 in damages for Inland's unjustified termination of the said subcontract. Accordingly judgment will enter for Northway against Inland for $118,484.00, plus interest computed at the statutory rate, *see* R.I.G.L. § 9–21–10 (amended 1976), on Count I.

## II.

In the second count of its complaint, Northway alleges that Dimeo induced, incited and caused the termination of the Inland-Northway erection subcontract and unjustly enriched itself by obtaining for its subsidiary, Brett, the work previously subcontracted to Northway. Northway seeks to recover from Dimeo future pecuniary losses, damages for mental suffering, an attorney's fee and punitive damages.

To prevail on its claim that Dimeo tortiously interfered with its relationship with Inland, Northway was required to establish: (1) Dimeo's intentional interference with the Inland-Northway subcontract and (2) the damages resulting therefrom. *Wayne Distributing Co. v. Schweppes U.S.A. Ltd.*, 352 A.2d 625, 629 (R.I.1976). The burden of proving sufficient justification for any interference proximately resulting in damages was upon Dimeo. *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973); Prosser, Torts § 129 at 942 (4th ed.1971).

To facilitate analysis of the instant issue the Court turns first to Dimeo's position as the general contractor and coordinator of the Civic Center project. This was a matter of public interest and Dimeo was under considerable public pressure to complete construction as nearly as possible to the original September 25, 1972, deadline. Unquestionably, Dimeo's public image and reputation in its trade were at stake, the greater the delay in substantial completion, the greater adverse effect on Dimeo.

Delays in the erection of siding threatened to prevent the timely completion of the Civic Center. In February, 1972, Inland had stated that it could complete the siding within twelve to fourteen weeks of commencement. In its job progress schedule made after receipt of Inland's said estimate, Dimeo determined that the erection of siding would begin April 1, 1972 and had a right to expect Inland to begin at that time. Yet, said erection did not begin until more than two months later. When erection of the siding began, a representative of Inland assured Dimeo that it could be completed within twelve weeks. At about the same time Dimeo learned that Northway still planned to devote as much as twenty weeks to the siding. As the coordinator of a complex job, involving subcontractors who were affected by the delays of other subcontrac-

tors, Dimeo was justified in demanding acceleration once erection began.

Northway contends and the evidence indicates that Dimeo primarily exerted pressure for acceleration on Inland, rather than directly on Northway. This was appropriate since Dimeo was enforcing in good faith, though strenuously, the terms of its contract with Inland, while it had no contract with Northway.

Dimeo did pressure Inland to have Northway permanently man standing scaffolding. Unquestionably the employment of such scaffolding represented one way to accelerate erection, though it involved extra work and expenses. Dimeo did not demand that these expenses be borne exclusively by Northway. Indeed, anticipating that Northway would claim this work as an extra, Dimeo arranged a compromise with Inland, freeing itself from any liability thereon and leaving it to Inland and Northway to settle any such claim. The problem arose, then, not so much from Dimeo's pressure as from Inland's refusal to recognize this work as an extra or to assume liability therefor, even after it concurred in the advisability of and directed the use of such scaffolding.

On occasion Dimeo representatives gave instructions directly to Northway personnel on the job, but these instructions were generally ignored and Northway did not prove that any damages resulted therefrom. Finally, Dimeo informed Inland that the delays and other problems being encountered during the erection of siding jeopardized future business relations between Dimeo and Inland. The Court finds nothing remarkable about this warning.

This is the extent to which the Court finds that Dimeo interfered with the contractual relationship between Northway and Inland; it provides no basis for recovery by Northway. The Court cannot conclude from the record that Dimeo went so far as to induce, incite or cause the termination of the Inland-Northway erection subcontract. The Court finds especially persuasive, in this regard, the testimony of Findlay and Elliott that the termination decision was Inland's exclusively, the efforts of Dimeo as late as the day of termination to ease Northway's labor problems and the absence of any credible testimony indicating that Dimeo wanted Northway off the job or, that prior to Inland's decision to terminate, Dimeo wanted for Brett the work subcontracted to Northway.

Moreover, even if this Court were to conclude that Dimeo had unjustifiably caused said termination, Northway would not prevail because it failed to prove any damages proximately resulting therefrom. Northway had the burden to establish its claim for damages with reasonable certainty. *Smith Development Corp. v. Bilow Enterprises, Inc., supra*; McCormick, Damages § 26 at 99–100 (1935). Instead, Northway introduced conflicting financial statements, some of which were unaudited, and focused on a comparison of gross sales without explanation or supporting extrinsic evidence sufficient to enable this Court to fix the loss of future profits with anything close to reasonable certainty. *Compare Doeltz v. Longshore, Inc.*, 126 Conn. 597, 13 A.2d 505, 507 (1940) *and Rainbow Island Productions, Ltd. v. Leong*, 44 Hawaii 134, 351 P.2d 1089 (1960) *with Smith Development Corp. v. Bilow Enterprises, Inc., supra*. In short, there were too many unanswered questions to establish a logical basis for recovery of compensatory damages against Dimeo. *See Namerow v. Colangelo*, 6 Conn.Cir. 9, 262 A.2d 187 (1969). There was also no showing of the kind of actual malice, wantonness or willfulness on Dimeo's part upon which this Court could or would award punitive damages. *See Adams v. Lorraine Mfg. Co.*, 29 R.I. 333, 71 A. 180 (1908); *Hargraves v. Ballou*, 47 R.I. 186, 131 A. 643 (1926).[9]

Accordingly, for the above reasons, judgment will be entered for Dimeo on Count II of the complaint.

---

**9.** Nor would the Court award the plaintiff an attorney's fee in this action. *See Washington Trust Co. v. Fatone*, 106 R.I. 168, 256 A.2d 490, 493 (1969); *Waite v. Board of Review of Department of Employment Security*, 108 R.I. 177, 273 A.2d 670, 671 (1971).

Counsel for Northway will prepare and submit for entry an order in conformity with this opinion.